COMMONWEALTH vs. KEVIN J. DOWNEY.

Middlesex. February 8, 1990. - May 17, 1990.

Present: WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Evidence*, Blood sample, Identity, Grand jury proceedings. *Search and Seizure*, Blood sample. *Constitutional Law*, Search and seizure. *Identification. Grand Jury. Practice, Criminal*, Grand jury proceedings, Indictment.

Where the evidence presented to a grand jury was sufficient to support the arrest or indictment of the defendant for robbery, and where the defendant was afforded an opportunity to be heard, no violation of his rights under the Fourth Amendment to the Constitution of the United States was occasioned by an order issued by a judge at the request of the grand jury requiring the defendant to be detained for the purpose of a blood test. [475-477]

At a criminal trial there was no error in the judge's denial of the defendant's motion to suppress photographic identifications. [478]

No substantial risk of a miscarriage of justice was demonstrated by the Commonwealth's having removed a certain photograph from an array before showing it to the victim and one eyewitness to a robbery. [479]

A criminal defendant's claim that the integrity of the grand jury that indicted him was impaired did not demonstrate that false or deceptive evidence had been given to the grand jury. [479-480]

INDICTMENTS found and returned in the Superior Court Department, four on January 29, 1987, and three on June 24, 1987.

A motion for production of blood, saliva, and hair samples was heard by *John Paul Sullivan*, J.; a motion to suppress evidence was heard by *Katherine Liacos Izzo*, J.; and the cases were tried before *James D. McDaniel, Jr.*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Charles A. Clifford* for the defendant.

*Wendy Murphy*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. After a jury trial in the Superior Court, the defendant, Kevin J. Downey, was convicted of armed robbery while masked, kidnapping, armed robbery, assault by means of a dangerous weapon, assault and battery, and unauthorized use of a motor vehicle. On appeal, he claims that (1) the Superior Court judge supervising the grand jury erred in ordering the defendant to comply with a grand jury order that he provide samples of his blood, saliva, and hair; (2) that a motion judge erred in denying his motion to suppress pretrial identifications of his photograph by witnesses to the kidnapping; and (3) that the trial judge erred in denying his motion to dismiss the indictments based on alleged improprieties in the Commonwealth's presentation of evidence to the grand jury. We transferred the case to this court on our own motion, and now affirm.

The jury could have found the following facts. On December 4, 1986, at 11:47 A.M., two masked men wearing hooded sweatshirts and "scally" caps robbed the Burlington branch of the Boston Federal Savings Bank (bank) of $85,000 in bills of small denominations. The two men sped away from the bank in a white automobile bearing Massachusetts registration number 556 FDM. The car was subsequently discovered in the parking lot of a nearby shopping mall. The back seat of the car contained a mask into which small amounts of hair and saliva had been deposited.

At noon on the same day, approximately fifteen minutes after the bank robbery, two men meeting the same general description as the bank robbers abducted Denis Renaghan in the parking lot of the Lahey Clinic (clinic) in Burlington. The two men threatened Renaghan with a gun, threw him into the back seat of his automobile, and drove to Cambridge. The clinic is only a short distance from the shopping mall where the getaway car was abandoned, and the police observed fresh footprints heading away from the getaway car and toward the clinic.

1. *Blood, saliva, and hair samples.* On January 29, 1987,
a Middlesex County grand jury returned four indictments
against the defendant, charging him with armed robbery, as-
sault by means of a dangerous weapon, kidnapping, and un-
authorized use of a motor vehicle. These indictments arose in
connection with the kidnapping of Renaghan.

On April 22, 1987, a second Middlesex County grand jury
were convened to investigate the December 4, 1986, bank
robbery. The first witness who testified was State Trooper
Robert Cox. Cox stated that he had examined the places
where the crimes had occurred and reported that the location
where the getaway car was abandoned was geographically
between the bank and the clinic, about one-quarter of a mile
from the bank and 300 yards from the clinic. He reported
that on the day of the crimes he had observed fresh foot-
prints heading away from the abandoned car and toward the
clinic. Cox testified that Renaghan had positively identified
the defendant from a photographic array as one of his
kidnappers.

Cox also reported that the investigation had revealed that,
during the few days following the bank robbery, the defend-
ant had purchased an automobile for over $14,000 and
rented a new apartment by making an initial payment of
$1,500. In each case, the defendant had paid entirely in cash
with bills of small denominations. In addition, searches of the
defendant's new apartment and his bedroom in his parents'
house had uncovered a gun, clothing, and caps similar to the
bank robbers' gun, clothing, and caps.

Cox also testified that the mask found in the back seat of
the abandoned getaway car had been forwarded to the Fed-
eral Bureau of Investigation (F.B.I.) for laboratory analysis.
The laboratory report, which was entered in evidence before
the grand jury, indicated that saliva and hair had been de-
posited in the mask. The report indicated that the saliva had
been deposited by a person with type O blood.[1] The report

---

[1]During the trial, there was expert testimony that most people secrete
small amounts of blood into other bodily fluids, such as saliva.

also indicated that the saliva and hair retrieved from the mask could be scientifically compared to blood, saliva, and hair samples taken from suspects in the criminal investigation.

At the conclusion of Cox's testimony the prosecutor requested that the grand jury vote on whether there was "sufficient cause" to order the defendant to provide blood, saliva, and hair samples.[2] The grand jury voted and then issued such an order.[3] Subsequently, the prosecutor filed a motion with the Superior Court judge supervising the grand jury to compel the defendant to provide the samples. Accompanying this motion were the grand jury's order, an affidavit from Cox summarizing his testimony, the F.B.I. laboratory report, and a memorandum of law in support of the motion. After a hearing during which both the prosecutor and defense counsel were heard, the supervising judge issued the order compelling the defendant to provide the samples.[4]

a. *The blood sample.* We address first the defendant's claim that that portion of the order compelling him to provide a blood sample violated his Federal constitutional rights because when the order issued, the defendant had not been arrested or indicted in connection with the bank robbery, no finding of probable cause to arrest him had been made, and no summons had been issued for his appearance before the grand jury.[5]

---

[2] Having been indicted and arrested for the offenses connected with the abduction of Renaghan, the defendant was already being held on bail and, therefore, readily available to provide the samples.

[3] Contrary to defense counsel's assertion at oral argument, nothing turns on the fact that the grand jury's request for the samples was termed an "order" rather than a "subpoena."

[4] The defendant's brief raises a question as to whether a blood sample was actually taken. In view of subsequent testimony as to the test results, however, there can be little doubt that a blood sample was taken.

[5] Although the defendant's brief does make one reference to art. 14 of the Massachusetts Declaration of Rights, the defendant does not develop an argument that the State Constitution provides greater protection in this context than does the Federal Constitution. We therefore confine our analysis to the protection provided the defendant by the Federal Constitution.

An order compelling the production of a blood sample is an intrusion that implicates protections provided by the Fourth Amendment to the United States Constitution. *Schmerber* v. *California*, 384 U.S. 757, 767 (1966). *Commonwealth* v. *Trigones*, 397 Mass. 633, 640 (1986).[6] In *Schmerber*, the Supreme Court held that, when a person was lawfully arrested in circumstances clearly suggestive of driving while under the influence of intoxicating liquor, the subsequent seizure of a blood sample was reasonable in light of the exigent circumstances present — the fact that his blood alcohol percentage could begin to decline rapidly. *Id.* at 770-771. In reaching this conclusion the *Schmerber* Court made clear that a government order compelling a person to produce corporeal evidence involves potential violations of the Fourth Amendment to the United States Constitution at two different levels: "the 'seizure' of the 'person' necessary to bring him into contact with government agents . . . and the subsequent search for and seizure of the evidence." *United States* v. *Dionisio*, 410 U.S. 1, 8 (1973).

The defendant does not challenge the constitutionality of the bodily intrusion necessary to "search for" and "seize" the blood sample. He apparently concedes that the grand jury could have constitutionally ordered the intrusion necessary to obtain his blood sample if their directive that he be detained had been proper. See *Matter of an Investigation into the Death of Abe A.*, 56 N.Y.2d 288 (1982) (upholding court order that a suspect in a homicide investigation produce a blood sample). Cf. *Commonwealth* v. *Trigones, supra* (upholding a postindictment order to produce a blood sample). The defendant's claim is that his detention for the purpose of a blood test in connection with the bank robbery investigation was unconstitutional because he had not first been indicted, arrested, subjected to a probable cause determination, or even summonsed to appear before the grand jury.

---

[6]Such an order does not implicate protections guaranteed by the Fifth Amendment to the United States Constitution because a blood sample is nontestimonial evidence. *Schmerber* v. *California*, 384 U.S. 757, 760-765 (1966).

Given the facts before us, we do not find this claim compelling. If the evidence before the grand jury would have supported the arrest or indictment of the defendant, he was not harmed by the fact that the order issued in the absence of either. We find that the evidence before the grand jury was adequate to meet this test. Cox's testimony before the grand jury concerning the defendant's cash purchases, as well as the gun, clothing, and caps recovered by the police from the defendant's apartment and his parents' house, suggested a direct link between the defendant and the bank robbery. In addition, Cox's testimony disclosed evidence linking the defendant to the kidnapping (Renaghan's positive identification of the defendant) and also linking the kidnappers to the bank robbery (location of the getaway car, the footprints, and the description of the robbers). This testimony provided ample support for the grand jury to have indicted the defendant.

Moreover, the defendant did receive a hearing before the supervising judge in which he was afforded the opportunity to oppose the grand jury order and to contest the constitutionality of his detention for the purpose of a blood test.

For these reasons, we hold that that portion of the order requiring that the defendant be detained for the purpose of a blood test did not constitute a violation of his rights under the Fourth Amendment.

b. *The saliva and hair samples.* With regard to that portion of the order requiring that the defendant appear to provide saliva and hair samples, the Commonwealth claims that, there having been no intrusion below the skin, a less stringent analysis applies. See *In re Grand Jury Proceedings*, 686 F.2d 135, 138-139 (3d Cir.), cert. denied, 459 U.S. 1020 (1982). Because the defendant again concedes that the "seizure" of the samples was constitutional so long as he was properly detained, we need not reach the question whether a lower standard applies to saliva and hair samples. We uphold that portion of the order compelling the production of saliva and hair samples.

2. *The photographic identifications.* The police inter-
viewed the kidnapping victim and two eyewitnesses to the
kidnapping on the day of the incident. All three were able to
describe the assailant. One week after the incident, the vic-
tim and the eyewitnesses were shown photographic arrays
consisting of nine black and white photographs and were
asked whether they could identify the assailant. One of the
eyewitnesses selected two photographs, one of which was that
of the defendant, and reported that, although she thought
that the assailant was one of the two men pictured, she could
not distinguish between the two. The victim and the other
eyewitnesses identified the defendant.

"Under our decisions a criminal defendant has the burden
to prove, by a preponderance of the evidence, that [a] wit-
ness was subjected by the State to a pretrial [photographic]
confrontation . . . 'so unnecessarily suggestive and conducive
to irreparable mistaken identification' as to deny the defend-
ant due process of law." *Commonwealth* v. *Venios*, 378
Mass. 24, 26-27 (1979). Applying this standard, we find that
the motion judge did not err in denying the defendant's mo-
tion to suppress the photographic identifications. Deliberate
inclusion of a suspect's picture in an array would only be im-
proper, in and of itself, if the array were too small. An array
of nine photographs, however, is not too small. See *Common-
wealth* v. *Mobley*, 369 Mass. 892, 897 (1976), citing *Sim-
mons* v. *United States*, 390 U.S. 377 (1968). In addition,
while it would have been preferable for the police to have
utilized a more current photograph of the defendant, the use
of an old photograph is not impermissibly suggestive. Indeed,
to the extent that a suspect's appearance may have changed
over time, use of an old photograph can only benefit him. As
to the other photographs included, the motion judge found
that all of them depicted "white males in their late teens or
early twenties with light complexions and no facial hair or
other distinguishing characteristics noticeable." She further
found that all the men, "except perhaps two," had "medium
to light" hair. In view of these facts, we conclude that the
motion judge's denial of the motion did not constitute error.

Defense counsel supports the claim that the photographic arrays were unnecessarily suggestive by arguing on appeal, for the first time, that the second photograph selected by the first witness was subsequently excluded from the arrays shown to the second witness and the kidnapping victim. The Commonwealth concedes that the "look-alike" photograph was in fact removed.

Because the defendant did not advance this argument below, we review the removal of the "look-alike" photograph to determine whether it gave rise to a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). We rule that it did not. The motion judge ruled that the victim had had "an excellent opportunity to view the perpetrator," and had given an accurate description of the defendant on the day of the incident. In addition, the victim positively identified the defendant in court at trial. There was no substantial risk of a miscarriage of justice. *Id.*

3. *Alleged improprieties before the grand jury.* The defendant claims that the judge supervising the grand jury erred in denying his pretrial motion to dismiss the indictments based on alleged improprieties in the Commonwealth's presentation of evidence before the grand jury. The defendant's motion rested on a number of factual allegations that the Commonwealth's presentation of evidence was biased and inaccurate. In particular, the defendant points to Trooper Cox's testimony that the police had apprehended the defendant after receiving information about him from members of "the criminal element," and that the defendant had purchased his automobile with "new found wealth." The defendant also objected to Cox's assertion that, on the day of the incident, Renaghan had described the defendant "[e]xactly."

"To sustain a claim that the integrity of the grand jury has been impaired, not only must the evidence have been given with knowledge that it was false or deceptive, but the false or deceptive evidence must probably have been significant in the view of the grand jury and must have been presented with the intention of obtaining an indictment." *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986).

The defendant's allegations of impropriety before the grand jury do not amount to a showing that false or deceptive evidence was introduced. All the statements were substantially true. Describing the defendant's notable supply of cash in small denominations as "new found wealth," or the description of the Renaghan identification as exact does not make the evidence of the cash or identification false or deceptive. The supervising judge did not err in denying the defendant's motion.

*Judgments affirmed.*