## COMMONWEALTH vs. TED JEFFERY OTSUKI.

Suffolk. October 8, 1991. - November 18, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Examination of jurors, Preservation of evidence, Disclosure of evidence. *Identification. Evidence*, Prior misconduct, Consciousness of guilt.

In a murder case, the defendant demonstrated no ground on which to assert a constitutionally based right to have individual voir dire of jurors conducted on the issue of racial prejudice [227-228]; nor did the defendant bring the issue to the attention of the trial judge at the time of jury selection [228-229]; nor, in any event, did the defendant demonstrate how the failure to have conducted individual voir dire on the issue prejudiced his case [229].

At a murder trial the Commonwealth abundantly proved that the murder was deliberately premeditated. [229-230].

At a murder trial the judge correctly denied the defendant's motion for dismissal based on the Commonwealth's alleged loss of evidence (bullet fragments), where the judge determined that the Commonwealth was not culpable for the loss, that the missing evidence was not material to the defendant's case, and that the defendant was not prejudiced by the missing evidence. [230-232].

There was no merit to a criminal defendant's claims that a witness's identification of the defendant from a photographic array was the product of an unduly suggestive identification procedure; that another witness's pretrial identification of the defendant from an unintentional and accidental observation of a wanted poster tainted his in-court identification; that a third witness's happening upon a newspaper photograph of the defendant was unnecessarily suggestive; or that the Commonwealth failed to inform the defendant of the witness's having seen the newspaper photograph. [232-235].

At a murder trial, no error appeared in the judge's admitting evidence of the defendant's carrying a firearm, where the evidence was proper to show that the defendant had the means to commit murder. [235-236].

At a murder trial, no substantial risk of a miscarriage of justice was created by the Commonwealth's eliciting from a witness on redirect examination further evidence that the defendant's automobile and a locker

he rented had contained firearms, once the defendant had elicited testimony on this subject during cross-examination. [236].

At a murder trial, evidence that the defendant was a fugitive from justice at the time of the crime was properly admitted to establish a motive for certain actions the defendant had taken [237], and evidence of the defendant's flight to Mexico was properly admitted on the issue of his consciousness of guilt [237].


INDICTMENTS found and returned in the Superior Court Department, five on October 14, 1987, and one on November 3, 1987.

The cases were tried before *Robert A. Mulligan*, J.

*Robert A. George* for the defendant.

*Thomas Mundy*, Assistant District Attorney (*Marina Medvedev*, Assistant District Attorney, with him) for the Commonwealth.

NOLAN, J. On May 16, 1989, a Suffolk County jury convicted the defendant of the murder in the first degree of Boston police Officer Roy Joseph Sergei, assault with intent to murder Boston police Officer Jorge Torres, assault and battery upon Officer Torres by means of a dangerous weapon, assault by means of a dangerous weapon upon Boston police Officer Christopher Rogers, assault by means of a dangerous weapon upon Boston police Officer William Kennedy and unlawfully possessing a firearm.[1] The defendant appeals from the convictions, claiming that the trial judge committed reversible error when he (1) denied the defendant's motion to conduct an individual voir dire of the venire as to prejudice or bias against Asians; (2) denied the defendant's motions for a required finding of not guilty of murder in the first degree; (3) denied the defendant's motion to dismiss based upon the unavailability of bullet fragments; (4) allowed certain in-court identifications of the defendant; and (5) allowed the Commonwealth to introduce evidence of the defendant's prior misconduct. The defendant further requests that we ex-

---

[1]The jury found the defendant not guilty on indictments charging assault with intent to murder Officers Rogers and Kennedy.

ercise our power under G. L. c. 278, § 33E (1990 ed.), and
order a new trial or reduce the murder conviction in the in-
terest of justice. We conclude that the interest of justice has
been served well in this case and affirm the convictions.

We summarize the tragic facts of this case as follows. On
September 28, 1987, the defendant, identifying himself as
Mark Taira,[2] rented an apartment on the second floor of a
building located at 371 Commonwealth Avenue in the Back
Bay section of Boston. The apartment windows faced Com-
monwealth Avenue. The defendant paid the required rent
and deposits in cash, stating that he did not believe in credit
cards. He listed a John Ling of Austin, Texas, as a reference
on the rental application and informed the manager that he
was renting temporarily while he looked for a position in the
computer industry. The defendant further informed the re-
ceptionist at the rental office that he had been to Boston
before and already knew about the area services and trans-
portation system. Later that day, the defendant rented a pos-
tal box under the name David Taira. He displayed a Califor-
nia driver's license to identify himself and listed John Ling as
a reference on the postal box application form.

The manager observed the defendant moving a considera-
ble amount of luggage into the building, including one bag
which seemed, from the sound it created when moved, to
contain metal objects. Over the next one and one-half days,
the receptionist in the rental office saw the defendant using
the public telephone in the building with the assistance of a
black box which made "musical noises,"[3] and the manager
saw him speaking with a parking meter attendant while
standing on the sidewalk in front of the apartment building.

On October 2, 1987, at approximately 1 A.M., a female oc-
cupant of à third-floor apartment in the building began to

---

[2]There was evidence at trial that the defendant used several aliases, in-
cluding Mark Taira, David Taira, and John Ling. The defendant testified
at trial and admitted that he had done so.

[3]The defendant testified that the black box was an "acoustical modem"
which enabled him to place long-distance calls to a computer and leave
messages.

scream, seeking protection from a male relative who then was beating her. The tenant managed to push the man out of her apartment into the common area. Once safely alone in her apartment, the tenant screamed out her window for help.[4] A man in the public alley at that time heard the tenant's pleas, asked for her address, and reported her complaint to the police.

Officers Kennedy and Sergei, then on duty in a rapid response car, received the report and proceeded to the apartment building. Officers Torres and Rogers heard the broadcast while patrolling the area and decided to respond as back-up support for Officers Kennedy and Sergei. The four officers met at the entrance to the apartment building and rang the tenant's doorbell. The tenant spoke to the officers through her intercom and explained that the buzzer in her apartment which operated the front door was broken and she was afraid to leave her apartment to let them in because her relative was outside her door.

At this point, Officers Torres and Rogers went to the rear of the building in search of a back entrance. Officers Kennedy and Sergei remained in the building foyer, ringing other doorbells and announcing their presence over the intercom. Meanwhile, another female tenant heard a loud crashing noise, which she described as sounding like "something heavy hitting metal."[5] The complaining tenant meanwhile observed through her window a man jumping from the building to the

---

[4] The tenant's apartment windows faced the rear of the building and overlooked Public Alley No. 905.

[5] The Commonwealth proceeded at trial on the theory that the defendant saw the police cruisers in front of the building, heard the police ringing the doorbell and assumed that the police had come to arrest him on a warrant that had issued for his arrest based on his violation of Federal parole. As a result, the defendant planned an escape. In keeping with this theory, the Commonwealth contended at trial that the sound reported by the female tenant was caused when the defendant jumped from the second-story rear staircase of the building to an air conditioning unit several feet below. In support of this theory, the Commonwealth introduced evidence of footprints found on the air conditioning unit which were similar to those found in the defendant's apartment.

fenced-in courtyard located in the public alley. She saw him land, brace himself, run toward a fence in the courtyard, hurdle the fence, and press himself up against the building.

Once in the alley, Officers Torres and Rogers observed the defendant in the courtyard, against the wall of the building. Officer Torres shone his high intensity flashlight on the defendant and asked him what he was doing. The defendant responded, "I'm just hanging around." Officer Torres ordered the defendant to climb over the fence, out of the courtyard and into the alley. Officer Torres then reported to Officers Kennedy and Sergei by means of a walkie-talkie that they had apprehended a suspect in the alley. The defendant climbed over the fence as directed and, when he landed on the ground, attempted to walk away from the police officers. Officer Torres grabbed the defendant and told him to face the fence and put his hands up. Standing approximately one foot from him, Officer Torres started to "pat down" the defendant. Within seconds, the defendant shoved Officer Torres, took a semiautomatic pistol from underneath his jacket and began to fire. Officer Torres yelled to Officer Rogers, "[H]e has a gun." In reaction, Officer Rogers pushed the defendant and sought cover behind an air conditioning unit in the alley. From this vantage point, Officer Rogers witnessed the defendant chase and shoot at Officer Torres, who then was attempting to flee the alley. Officer Rogers drew his revolver at this time, but he could not fire at the defendant because of the dangerous proximity of Officer Torres. Officer Torres emerged from the alley screaming, "I've been shot."

Then, Officers Kennedy and Sergei approached the alley entrance. Officer Kennedy placed himself against the wall of the apartment building and drew his revolver. Officer Sergei continued walking toward the mouth of the alley, and he there encountered the defendant. Officers Torres and Kennedy observed the defendant at this point look to his right, hesitate for a few seconds, turn toward Officer Sergei, and fire several times at Officer Sergei, hitting him in the chest, right flank, and right buttock. Officer Sergei fell to the ground and the defendant fled the scene, running down Mas-

sachusetts Avenue. Officer Torres pulled out his revolver and fired three or four shots at the defendant. He then went to assist Officer Sergei on the sidewalk and there collapsed as a result of the bullet wounds he had sustained to his left arm, left buttock, rectum, and chest. Officer Kennedy fired a single shot and chased the defendant for a distance. The defendant escaped.

Officers Torres and Sergei each required extensive surgery and medical care. Officer Torres remained hospitalized for over two weeks and eventually he recovered from his injuries. Officer Sergei's condition was complicated by the spinal injury he sustained. There was competent medical testimony that Officer Sergei's spinal cord damage resulted in lower extremity weakness which, in turn, caused him to develop blood clots in his legs and ultimately suffer a fatal pulmonary embolus.

The subsequent investigation of the crimes revealed the following significant facts about the defendant. From September, 1987, to the date of the crime, the defendant was wanted for a Federal parole violation in the Southern District of Texas. The defendant faced up to ten years in prison as a result of this violation. In August, 1987, the defendant purchased a Sig Sauer nine-millimeter pistol, a box of Winchester nine-millimeter "Silver Tip" bullets, a Taurus .38 caliber special, a pair of "Packmeyer grips," a pack of glazier .38 caliber special ammunition, and a box of Fiuchi nine-millimeter ammunition under the name David Michael Taira at the Alamo Gun Shop in the Bellaire section of Houston, Texas.

In the aftermath of the shootings, investigators found several cartridges from a semiautomatic pistol in and around the alley. The investigators also discovered a fragment of a bullet and its jacket just outside the alley entrance. A ballistics expert tested these materials and concluded that they were fired from the defendant's Sig Sauer semiautomatic nine-millimeter pistol. Furthermore, this material was the same type of ammunition later found, pursuant to a search warrant, in the defendant's Commonwealth Avenue apart-

ment. Tests conducted by the ballistics expert would warrant the conclusion that the two bullets that were removed from the body of Officer Sergei were fired from the defendant's Sig Sauer pistol. The Commonwealth presented evidence that the defendant's latent fingerprint appeared on a bullet contained in one of the cartridges located at the scene of the crime.

Each of the witnesses who observed the defendant at the time of the shooting described his attire at that time: blue jeans, sneakers, a striped shirt, and a dark jacket with white cuffs. Blood-stained clothing fitting this description was found later in the defendant's car. The striped shirt also had a hole on its right side, consistent with the passage of a bullet. Lead residue, as would appear as a result of the impact of one of the Boston police-issued lead bullets, was detected on this shirt.

On August 31, 1987, one month before the incident in Boston, an off-duty San Francisco police officer, Sergeant Greg Lynch, had observed the defendant outside a movie theater. Sergeant Lynch noticed that the defendant was carrying a gun with a blue steel handle in a holster under his jacket. Lynch saw the defendant drive away in a "newer" silver or light blue Plymouth automobile with a Texas registration plate. Later, he made a computer inquiry into the identity of the vehicle owner. The police department recorded this information and the name "David M. Taira," which they received from the Department of Motor Vehicles of Texas and entered in their computer.[6]

James Burkhart, a witness for the Commonwealth, testified that he met the defendant while the two were in Federal prison. Burkhart stated that the defendant talked with him

---

[6]Approximately five or six weeks following this incident, Sergeant Lynch observed several wanted posters depicting the defendant. He testified that he recognized the defendant as the person whom he saw outside the movie theater and confirmed his suspicions by checking the police computer information and matching it with the information supplied by the Boston police on the wanted poster. Sergeant Lynch reported his findings to his police captain.

sometime in late September, 1987, and stated that he was going to Boston to meet a "Mr. Joost." The defendant called Burkhart again in early October and stated that he had been involved in a shooting in Boston and had been shot in the arm. The defendant further told Burkhart that, if he wanted a car, he could pick up the defendant's Plymouth Sundance automobile in a Dayton, Ohio, parking lot. The defendant told Burkhart that he could have the car and its contents, but that he wanted Burkhart to dispose of the Sig Sauer nine-millimeter pistol located in the console. Burkhart agreed and the defendant mailed Burkhart the keys to the automobile, the parking receipt, and directions to the lot. Burkhart travelled to Dayton, Ohio, retrieved the car, and drove to his parents' house in Salem, Missouri. Burkhart gave his father the weaponry that was in the car.[7] Burkhart returned to San Francisco where he deposited the clothing and other items from the car in a storage locker rented by the defendant.

As a result of Sergeant Lynch's information, San Francisco police, in cooperation with Boston police, were able to trace the defendant's car to Burkhart. After much negotiation, Burkhart entered into an immunity agreement and testified for the Commonwealth. Burkhart supplied investigators with considerable information regarding the defendant, and he aided them in locating him in Mexico. The defendant ultimately was apprehended by Federal authorities in Guadalajara, Mexico, and was extradited to the United States for prosecution in the Commonwealth.

The defendant testified at trial. In essence, he defended himself on the ground that he had been misidentified as the person involved in the shooting on October 2, 1987. The defendant claimed that he purchased the weapons and rented the apartment as part of a deal with James Burkhart to set up a "safe house" in Boston, where Burkhart allegedly

---

[7]The weapons later were retrieved from Burkhart's father and presented as evidence at trial. Ballistics experts for the Commonwealth performed · tests on the weapon and ammunitions and, based on their findings, opined at trial that the bullets which struck Officers Torres and Sergei were discharged from the defendant's Sig Sauer semiautomatic pistol.

planned to commit armed robbery. The defendant testified that Burkhart and his criminal associate, Tony Kang, a Korean-Chinese individual, came to Boston on October 2, 1987. According to the defendant, while the three men were in the Commonwealth Avenue apartment, Kang accidentally shot the defendant in the arm. The defendant stated that he thereafter left Boston and drove to Chicago to seek medical attention from a nurse who was the girl friend of a friend. Since he was "on the lam" due to the parole violation, the defendant explained, he was afraid to seek medical attention at a hospital.

The defendant concluded his testimony by recounting his travels back to Texas, where his father arranged for him to receive medical treatment in Mexico. The defendant stated that he remained in Mexico with relatives and did not return to the United States because of the outstanding Federal arrest warrant for his parole violation.

1. *Individual voir dire.* The defendant claims that the judge erred in denying his request to question the venire on an individual basis regarding prejudice or bias against Asians. The defendant asserts that the failure to permit the inquiry violated his fundamental right to a fair trial under Federal law.

Prior to jury selection, the defendant presented the judge with a motion for an individual voir dire and thirty-two proposed questions for potential jurors. One of the questions inquired into the jurors' possible bias or prejudice against persons of Asian or Oriental extraction. The judge denied the defendant's motion, stating that he believed the jury already responded to most of the proposed questions when answering the jury questionnaire. The judge invited the defendant, however, to request additional juror questioning whenever he wanted further assurance of a juror's impartiality.

On the first day of empanelment, approximately fifty-nine potential jurors appeared for consideration. The judge questioned the entire venire as to their bias or prejudice against

the defendant generally,[8] and then he interviewed each member of the venire individually. At the end of the day five jurors were declared indifferent and seated on the jury. At no time did the defendant seek to ask any potential juror about his or her bias or prejudice against Asians.

A second venire assembled for questioning the following day. The defendant moved to strike this venire and the five jurors seated the previous day on the ground that neither venire included Oriental persons. Defense counsel informed the judge at that time that the defendant was "[f]ull-blood Japanese." The judge denied the defendant's motion and the jury selection was completed. During a lobby conference following the jury selection, the judge informed defense counsel that he did not realize that the defendant was Japanese, this fact never having been brought to his attention nor having been apparent to him after meeting the defendant. In light of this information, however, the judge offered to question the jurors individually in his lobby to ascertain whether any of them harbored prejudice or bias against Asian persons. The defendant rejected this offer, expressing the view that the inquiry could inflame the minds of the jurors.

In *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), we adopted the rule that a judge must conduct an individual voir dire of prospective jurors on the issue of racial prejudice in cases involving interracial murder. As a matter of law we held that in such cases a substantial risk exists that the extraneous issue of race will affect the impartiality of the jury. *Id.* We based this principle on our superintendency powers to implement the policy set forth in G. L. c. 234, § 28, and not on constitutional considerations. *Young, supra* at 398 n.8.

Significantly, the defendant does not rely on the *Young* case or the reasoning it employs to support his claim. Rather, the defendant asserts that he was denied a right based on Federal law to have an individual voir dire conducted. Fed-

---

[8]The judge asked the venire: "Are any of you aware [or] sensible of any bias or prejudice in relation to the defendant, the Commonwealth, or any of the possible witnesses in this case?"

eral law requires, however, that an individual voir dire be conducted only in cases "where racial issues 'are inextricably bound up with the conduct of the trial.' " *Young, supra* at 399, quoting *Ristaino* v. *Ross*, 424 U.S. 589, 597 (1976). Since the issue of race was not even remotely connected to the conduct of this trial, there is no ground on which to assert a constitutionally based right to an individual voir dire in this case. "[T]he mere fact that the defendant and the victim[s] [were] of different races does not impose constitutionally mandated voir dire on the issue of race." *Young, supra* at 400, citing *Commonwealth* v. *Hobbs*, 385 Mass. 863, 874 (1982). To be sure, there was no suggestion at trial that "the defendant was a special target of racial bias." *Young, supra* at 400.[9]

Even viewing the defendant's claim under the *Young* rule, we find it is without merit. The record indicates that the judge did not know that the defendant was "[f]ull-blood Japanese," or, more importantly, that the defendant was concerned he would be the object of racial prejudice as a result of his background. Defense counsel's inclusion of one question regarding prejudice or bias against Asians in his set of thirty-two proposed questions to the jurors cannot be regarded as having notified the judge or the Commonwealth of this fact. The defendant never brought this particular issue to the judge's attention when the judge denied the defendant's motion to have the questions answered by the venire, despite having been informed by the judge that he would hear counsel on any particular matter he wanted to raise before the potential jurors. Furthermore, it is apparent from the record that the question of an individual voir dire on the

---

[9]Indeed, the trial judge pointed out, "[R]ace has no place in this case. . . . [T]he person who was firing at police officers was firing at blue uniforms, not firing at people of different races, colors." Furthermore, the record reflects that, although the defendant is Japanese, the victims included two white men (one of whom was the murder victim, Officer Sergei), an Hispanic, and a black man. Given these demographics, it is hard to figure that the jury regarded the defendant's race as a significant factor in this case.

issue of racial prejudice was first properly raised by the judge, after he considered the defendant's motion to strike the second venire on the ground of a lack of representation of Asian persons. The defendant did not desire at that time to question the jury, citing the likelihood of inflaming the minds of the jury by doing so, despite the judge's offer to perform the questioning in a nonleading manner. The judge is not required to raise these issues for the defendant, especially where he has no factual basis for inquiring into them. The responsibility for addressing this issue must fall to the defendant.

In any event, the defendant has not demonstrated how the failure of the judge to conduct an individual voir dire prejudiced his case. *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. 215, 224 (1985). Given the substantial amount of evidence supporting a finding of the defendant's guilt in this matter, there appears no reason to believe that the jury improperly considered race in arriving at their findings.

2. *Denial of the defendant's motions for a required finding of not guilty.* The defendant argues that he was entitled to a required finding of not guilty of murder in the first degree because the Commonwealth failed to introduce any evidence of premeditation or deliberation. In light of the evidence presented at trial, this argument borders on the preposterous.

In order to establish premeditation and deliberation, it is incumbent on the Commonwealth to demonstrate that the defendant's resolve to kill as a result of reflection which "[was] not so much a matter of time as of logical sequence." *Commonwealth* v. *Soares*, 377 Mass. 461, 469-470, cert. denied, 444 U.S. 881 (1979), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905). The Commonwealth abundantly proved the element of deliberate premeditation in this case.

The Commonwealth presented evidence at trial from which the jury reasonably could find that, on the night of the shooting, the defendant believed that the police had come to the apartment building to arrest him on the Federal warrant which issued as a result of his parole violation. With this

thought in mind, the defendant armed himself with a semi-
automatic weapon and attempted to flee out the back of the
building. The jury further could have found that, while
shooting at, wounding, and chasing Officer Torres in the pub-
lic alley, the defendant anticipated a confrontation with one
or more police officers at the entrance to the alley.[10] As ex-
pected, the defendant encountered the victim, Officer Sergei.
At the moment the defendant arrived at the entrance to the
alley, he turned, observed Officer Sergei, hesitated for a few
seconds, and then fired at least three rounds from his semiau-
tomatic weapon at Officer Sergei, hitting him in the chest,
flank, and buttock. There was competent medical evidence
that Officer Sergei died as a result of the trauma he suffered
from the bullet wounds. We would be hard pressed to create
a factual scenario more compelling than this to illustrate de-
liberately premeditated murder. The judge properly denied
the defendant's motions for a required finding of not guilty of
murder in the first degree.

3. *The missing ballistic evidence.* The defendant argues
that the judge erred when he denied the defendant's motion
for dismissal based on the Commonwealth's alleged loss of
bullet fragments which were removed from Officer Sergei at
Brigham and Women's Hospital prior to his death. The de-
fendant theorized that this evidence may have been exculpa-
tory, because it could have proved that Officer Sergei was
shot by a weapon other than the one claimed to have been in
the defendant's possession at the time of the shooting. The
judge denied the defendant's motion, finding that the bullet
fragments had been lost by the hospital staff and that neither
the Commonwealth nor its agents ever possessed them. We
will not disturb these findings of fact in the absence of clear
error. *Commonwealth* v. *Hine*, 393 Mass. 564, 568 (1984).

Whenever potentially exculpatory evidence is lost or de-
stroyed, the judge must weigh (1) the Commonwealth's cul-

---

[10]The Commonwealth contended at trial that the defendant knew that
other officers would appear in the alley area, since he overheard Officer
Torres radio that he had apprehended a suspect there.

pability as to the lost evidence; (2) the materiality of the lost evidence; and (3) the potential prejudice to the defendant as a result of the unavailability of the evidence. *Commonwealth v. Willie*, 400 Mass. 427, 432 (1987). In the present case, the judge found that neither the Commonwealth nor the police possessed the bullet fragments at any time. Based on credible testimony, the judge concluded that the hospital staff failed to follow the written hospital procedure for maintaining ballistic evidence and subsequently lost the bullet fragments. These facts justified the judge's conclusion that the Commonwealth was not culpable for this loss. See *Commonwealth v. Pisa*, 372 Mass. 590, 596-597, cert. denied, 434 U.S. 869 (1977).

Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist. *Commonwealth v. Wilson*, 381 Mass. 90, 107 (1980), *S. C.*, 399 Mass. 455 (1987). Quite apart from the missing bullet fragments, the Commonwealth introduced substantial evidence at trial which warranted finding that Officer Sergei died as a result of injuries caused by bullets which could have come from the defendant's weapon. Therefore, even if the missing bullet fragments would have established that Officer Sergei was shot by bullets discharged from two different weapons, it is difficult to see how they would raise a doubt as to the defendant's guilt. The judge correctly concluded that the missing evidence was not material to the defendant's case.

Lastly, the judge determined that the defendant was not prejudiced by the fact of the missing bullet fragments. A defendant may be prejudiced by lost or destroyed evidence, if such evidence is exculpatory. *Commonwealth v. Willie*, 400 Mass. 427, 433 (1987). A defendant is entitled to relief, however, only if he establishes that the missing evidence provides a reasonable possibility of being favorable to his cause "based on concrete evidence rather than a fertile imagination." *Commonwealth v. Neal*, 392 Mass. 1, 12 (1984). The defendant claims prejudice in this case to the extent that, without the missing ballistic evidence, he could not support

his testimony that either Burkhart or Kang shot Officer Sergei. Given the overwhelming evidence with respect to the defendant's possession and use of the murder weapon, the defendant's argument clearly is the product of a fertile imagination. The judge properly denied the defendant's motion to dismiss based on the missing bullet fragments.

4. *Witness identifications.* The defendant claims that the judge erred in allowing a witness who was present at the scene of the shooting to identify the defendant at trial.[11] The defendant moved for a mistrial based on the alleged failure of the Commonwealth to provide him with information concerning the witness's prior identification of the defendant from a newspaper picture. The defendant further claims that the judge erred in denying his motion to suppress the out-of-court identifications of the defendant by Officers Torres and Rogers. The defendant asserts that he is entitled to a new trial because the circumstances of all three identifications were unnecessarily suggestive. There is no merit to these arguments.

The defendant first contends that Officer Torres's identification of the defendant from a photographic array, after his exposure to pretrial publicity, was made under unduly suggestive circumstances and should have been suppressed. "Under our decisions a criminal defendant has the burden to prove, by a preponderance of the evidence, that the witness was subjected by the State to a pretrial confrontation, either photographic or in person, 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." *Commonwealth* v. *Venios*, 378 Mass. 24, 26-27 (1979), quoting *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-866 (1976). In considering whether to suppress such evidence, a judge should consider the totality of the circumstances attending the confrontation

---

[11]This witness observed the defendant during the shoot-out with the police on October 2, 1987. She saw the defendant while she was standing across the street from the apartment building, approximately 116 feet away from the alley entrance.

to determine whether it was unnecessarily suggestive. *Commonwealth* v. *Botelho, supra.*

In this case, the judge found that there was nothing in the photographic array or in the manner in which the photographs were reproduced and displayed to Officer Torres that tainted his identification of the defendant. In reviewing a judge's denial of a defendant's motion to suppress, this court will "accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990), and cases cited. There was no error in the judge's denial of the motion to suppress Officer Torres's identification. Officer Torres was shown a photographic array of eleven photographs while he was in the hospital seven days after the shooting. There was nothing improper about the number of photographs or the seven-day delay. *Commonwealth* v. *Downey,* 407 Mass. 472, 478 (1990). Officer Torres testified that he had not seen any photographs of the defendant, either on television or in the newspapers, prior to viewing the photographic array. Considering these facts, we conclude that the judge did not err in allowing Officer Torres's pretrial identification in evidence. Because the circumstances of the officer's pretrial identification were not unnecessarily suggestive, no taint attached to his in-court identification. *Commonwealth* v. *Clifford,* 374 Mass. 293, 304 (1978), and cases cited.

The crux of the defendant's argument against Officer Rogers's identification is that the circumstances of his out-of-court identification of the defendant, which was based on seeing the defendant's portrayal on a wanted poster, were highly suggestive and thus tainted his in-court identification. The judge found that Rogers's identification resulted from an unintentional, accidental confrontation. In examining the totality of the circumstances, we agree with the judge that this confrontation was not unnecessarily suggestive. Rogers observed the wanted poster over the shoulder of another police officer who was unaware of Rogers's presence. It was only at that point that Rogers recognized the photograph on the poster and notified the detectives that this photograph was a

portrayal of the individual whom he had seen on the night of the shooting. While an identification from a single photograph can be inadmissible, it is not subject to a per se exclusion. *Commonwealth* v. *Storey*, 378 Mass. 312, 317 (1979), cert. denied, 446 U.S. 955 (1980). An accidental confrontation, when the police make no attempt to elicit an improper identification, is permissible. *Commonwealth* v. *D'Ambra*, 357 Mass. 260, 263 (1970). There being no evidence of any improper police activity — indeed, the defendant does not even contend that there is any such evidence — we affirm the judge's denial of the motion to suppress Rogers's identification.

The defendant next asserts that the prosecution failed to provide him with exculpatory information that a witness had identified him from a newspaper photograph, and contends that this identification was also the product of unnecessarily suggestive circumstances. On cross-examination, the witness stated that she had seen the defendant's photograph in a newspaper in the summer of 1988 and that she had later so informed the Commonwealth. On the following day of trial, the defendant moved to strike and thereafter moved for a mistrial based on the witness's testimony. The judge denied these motions. On appeal, "our review is limited to whether it was an abuse of discretion for the judge to deny such a motion." *Commonwealth* v. *Perez*, 405 Mass. 339, 345 n.8 (1989). Based on the record as a whole, we cannot say that the judge abused his discretion. Contrary to the defendant's assertion, there is a dispute as to whether the witness communicated with the district attorney's office after seeing the defendant's picture in a newspaper and whether the Commonwealth possessed this information. The prosecutor did not learn about the witness's observation of the newspaper photograph until the day of her testimony. There is nothing in the record to show that the Commonwealth even possessed the supposedly exculpatory information which the defendant claims the Commonwealth withheld from him.

Additionally, there was nothing suggestive about the circumstances of the witness's identification. In the absence of

police manipulation of the press, "simple exposure to the media is not sufficient ground to suppress an identification." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 542 (1990). "The initial burden rests on the defendant to show, by a preponderance of the evidence, that, considering the totality of the circumstances attending the particular identification, the witness was subjected *by the State* to an identification so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law" (emphasis added). *Commonwealth* v. *Holland*, 410 Mass. 248, 253 (1991). In this case, the State subjected the witness to nothing; she simply happened upon the newspaper photograph on her own. Her identification testimony was properly presented to the jury.

5. *Denial of the motions to exclude certain evidence of the defendant's past misconduct.* The defendant strenuously argues that the judge erred when he allowed the Commonwealth to introduce evidence of prior bad acts. First, the defendant contends that the judge improperly allowed Sergeant Greg Lynch to testify as to his observations of the defendant outside a San Francisco movie theater in August, 1987. Specifically, the defendant argues that Lynch's description of a handgun he saw the defendant carrying on that occasion was irrelevant and highly prejudicial.[12] The defendant moved to strike the testimony on that ground. The Commonwealth responded, and the judge agreed, that the testimony properly was admitted for the purpose of demonstrating that the defendant possessed the means to accomplish the crime, regardless of whether the defendant actually employed that means to commit the crime. Since the defendant objected to the testimony, we consider whether the judge abused his discretion in allowing the testimony and committed palpable er-

---

[12]As part of his claim of prejudice, the defendant contends that Sergeant Lynch described a gun different from the murder weapon and, therefore, his testimony had no probative value and resulted in substantial harm to the defendant. The Commonwealth asserts that Sergeant Lynch described a gun like the murder weapon, the only variation being the color: dark blue rather than black.

ror. *Commonwealth* v. *Marangiello*, 410 Mass. 452, 456 (1991).

"Evidence of prior bad acts is not admissible to show that the defendant has a criminal propensity or is of bad character." *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990). Such evidence, if relevant, may be admitted, however, if it is offered for a purpose other than impugning the defendant's character, and if its probative value is not substantially outweighed by any prejudice. *Id.* The testimony of Sergeant Lynch passes muster under this test. As the Commonwealth states, the testimony speaks to the defendant's ability to possess the means to commit the crimes alleged. *Id.* The judge properly determined, moreover, that the probative value of this evidence outweighed any possible prejudice to the defendant by its admission.[13]

The defendant also attacks the judge's decision to allow the Commonwealth to introduce evidence of various weapons discovered in the defendant's car at the time Burkhart possessed it, as well as weapons found in the San Francisco storage locker rented by the defendant. Contrary to the defendant's assertions, however, the Commonwealth did not introduce this evidence. Instead, the defendant elicited this testimony from Burkhart during cross-examination. Having opened the door to this information, the defendant essentially invited the Commonwealth to address the issue on redirect examination. See *Commonwealth* v. *Mahoney*, 400 Mass. 524, 532 (1987). For this reason, the defendant's claim of prejudice is highly suspect. Even assuming, however, that the testimony prejudiced the defendant in some manner, such prejudice did not create a substantial risk of a miscarriage of justice in this case. *Commonwealth* v. *Lawrence*, 404 Mass. 378, 394 (1989). The Commonwealth's case against the defendant was very strong, and the jury had abundant evidence

---

[13]It is noteworthy that the defendant testified at trial that Sergeant Lynch may very well have seen him carrying a gun at a San Francisco theater.

to convict the defendant of murder and other crimes, regardless of this testimony.

The defendant next asserts that the evidence of his status as a fugitive from justice should have been excluded at trial because it unfairly portrayed him as a danger to society. We disagree. This relevant evidence established a critical aspect of the Commonwealth's case, namely, motive. The Commonwealth introduced evidence of the defendant's parole violation in order to explain why he fled from the apartment building when the police arrived. Evidence of prior misconduct is admissible for this purpose.[14] *Commonwealth v. Libran*, 405 Mass. 634, 640 (1989).

Finally, the defendant argues that the judge should not have allowed the Commonwealth to present evidence of the defendant's flight, his hiding in Mexico, and his subsequent arrest by Federal authorities. The defendant claims that the introduction of such evidence placed him in an unfavorable light and constituted reversible error. The evidence offered by the Commonwealth properly was provided to the jury as evidence of the defendant's consciousness of guilt. *Commonwealth v. Toney*, 385 Mass. 575, 583-584 (1982). There was no error in the admission of this evidence.

6. *G. L. c. 278, § 33E.* After reviewing the entire record, we are satisfied that there exists no reason for us to exercise our extraordinary power under G. L. c. 278, § 33E, to disturb the verdict of murder in the first degree returned in this case.

*Judgments affirmed.*

---

[14]We note that the defendant capitalized on this evidence while he testified in an effort to explain his actions while "on the lam."