COMMONWEALTH vs. WALTER F. MILLER.

No. 95-P-589.

Norfolk. September 10, 1996. - May 23, 1997.

Present: DREBEN, JACOBS, & FLANNERY, JJ.

*Search and Seizure,* Blood sample, Probable cause. *Constitutional Law,* Search and seizure. *Due Process of Law,* Seizure of blood sample. *Probable Cause.*

In an aggravated rape case, in which a Superior Court judge had in 1991 ordered blood, hair and saliva samples to be taken from the defendant at the request of the investigating grand jury before the defendant had been indicted or formally charged with a crime, and in which on appeal from his conviction the defendant contended that he should have been afforded notice and opportunity to be heard before the judge ordered his blood to be extracted in accordance with *Matter of Lavigne,* 418 Mass. 831 (1994), this court concluded that the most the defendant would be entitled to is a remand of the case for a *Lavigne* hearing: in the circumstances, where the record afforded a more than adequate basis to apply the *Lavigne* criteria, this court undertook to do so. [705-707]

In a criminal case, this court concluded that, had the Superior Court judge in 1991 conducted an adversary hearing applying the criteria of *Matter of Lavigne,* 418 Mass. 831 (1994), the approval of the investigating grand jury's request for the extraction of a blood sample from the unindicted defendant was inevitable or "certain as a practical matter," where probable cause existed at that time to believe the defendant had committed the serious crimes in question, where the blood was relevant evidence and clearly would be important to the investigation, and where a less intrusive means of obtaining the blood was unavailable. [707-710]

INDICTMENTS found and returned in the Superior Court Department on January 16, 1992.

A pretrial motion to suppress evidence was heard by *John C. Cratsley,* J., and the cases were tried before *Suzanne DelVecchio,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Beverly J. Cannone,* Committee for Public Counsel Services, with him), for the defendant.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

JACOBS, J. Convicted by a Superior Court jury on ten indictments[1] arising from the assault, aggravated rape, and armed robbery of a seventy-seven year old woman in her home, the defendant was sentenced to life imprisonment followed by consecutive sentences aggregating a minimum of seventy years imprisonment. The trial was preceded by the denial, after hearing, of a motion to suppress evidence relating to blood, hair, and saliva samples which had been taken from the defendant pursuant to the order of a Superior Court judge issued before the defendant had been indicted or formally charged with a crime. The judge had acted on a motion of the Commonwealth following a request for such samples made by an investigating grand jury on September 18, 1991.

Witnesses before the grand jury testified that the victim, responding to a knock on her door on the evening of September 6, 1991, observed a man, unknown to her, standing in the foyer area. The man asked for a specific person by name and, upon being told that no one by that name lived there, drew a kitchen knife from his left pocket and forced his way into the home. The man then subjected the victim to a series of brutal rapes, assaults and other crimes before tying her up and threatening to kill her if she called the police. After she ultimately untied herself and summoned the police, she gave them a detailed description of the assailant. In the course of their investigation, the police collected seminal fluid at the crime scene. On the day following the crimes, the victim constructed a composite representation of the assailant. Approximately ten days later, she identified the defendant as her assailant from an array of fifteen photographs presented to her by the police. The grand jury also were informed that if blood and saliva samples are taken from a possible suspect of a sexual assault, a determination can be made whether the seminal fluid found at the crime scene "is or is not consistent with the blood factors present in the blood and the seminal fluid of a potential suspect." The jurors were told that human

---

[1]The defendant was charged on three indictments for aggravated rape and on indictments for armed assault in a dwelling, armed robbery, assault and battery, indecent assault and battery, and assault and assault and battery with a dangerous weapon on a person sixty-five years or older.

hairs had been found at the crime scene and that they could be compared with the hair of the potential suspect to determine consistency. At that point, the jurors, upon request of the presenting assistant district attorney, voted to order the defendant to provide samples of his blood, saliva, and hair "for purposes of comparing them to evidence left at the crime scene."

On the day following the grand jury request, the Commonwealth filed a motion in the Superior Court requesting an order that the defendant submit to a blood test and provide hair and saliva samples. The motion was accompanied by a transcript of the vote of the grand jury, an affidavit of an investigating officer describing the crimes, an affidavit of a Commonwealth chemist experienced in conducting serological examinations indicating that if she received and tested the requested blood saliva and hair, she could determine whether or not the defendant was a "probable source" of certain hair, saliva deposits, and seminal stains found at the crime scene. The affidavit of the police officer indicates that as a result of the continuing investigation, he obtained information that the defendant was a possible suspect in this assault. He informed the court that the defendant was being held at the Plymouth County house of correction on an unrelated charge of attempted breaking and entering into an elderly person's home on September 11, 1991. The officer indicated that at the time of his arrest, the defendant was found to have a kitchen knife in his pocket and that he resembled the composite done by the victim. Upon receiving this information, the judge ordered the defendant to provide the requested saliva and hair samples and to submit to a blood test to be performed "by a medical doctor at the Norfolk District Attorney's office." Later that day, the defendant was brought from the Plymouth house of correction to the library of the office of the district attorney for Norfolk County where a physician performed the blood extraction.

Relying on *Matter of Lavigne,* 418 Mass. 831 (1994), decided while this case was pending appeal, the defendant claims that his motion to suppress was denied erroneously because he had not been afforded notice and opportunity to be heard before the judge ordered his blood to be extracted. In *Lavigne,* the court, indicating it was "simply developing the common law," held that a person who was "not charged

with a criminal offense nor the subject of a grand jury investigation" was "entitled to a hearing from which the judge must make findings as to the degree of intrusion . . . and the need for the evidence of the blood sample." *Id.* at 832, 835. The court instructed that the prosecution must establish "probable cause for believing that the person whose blood the Commonwealth seeks has committed the crime," *id.* at 835, and that "the blood found ·at the scene . . . is relevant in the Commonwealth's investigation . . . ." *Id.* at 836. The court further stated that "in deciding whether to order an extraction of blood, the judge 'must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other.'" *Id.* at 836, quoting from *Matter of an Investigation into the Death of Abe A.*, 56 N.Y.2d 288, 291 (1982). In reversing an order denying the defendant's motion for a return of a sample of his blood and remanding the case to the Superior Court, the court in *Lavigne* stated that if the judge made the prescribed findings, the seizure of blood would be considered to be reasonable and, therefore, not violative of "State and Federal constitutional protections against either unreasonable searches and seizures or the denial of due process of law." *Id.* at 836.

The defendant argues that failure to comply with the *Lavigne* rule necessitates reversal; the Commonwealth contends, on several grounds, that, notwithstanding the fact that the defendant was not accorded a pre-extraction adversary hearing, reversal is not required. Without deciding the issues[2] raised, we agree with the Commonwealth that the most to which the

[2]Among the issues argued to us are the retroactivity of *Lavigne* and its applicability to the case given that the defendant here was in jail and under grand jury investigation at the time of the extraction order. See *Commonwealth* v. *Downey,* 407 Mass. 472, 475-477 (1990). Also, the parties argue whether the defendant assented to the drawing of his blood and therefore waived any right he may have had to an adversary hearing. They also debate whether any failure to conduct an adversary hearing was harmless beyond a reasonable doubt given what the Commonwealth maintains is the overwhelming evidence of the defendant's guilt. As to the latter issue, although evidence of the defendant's guilt, apart from the blood test results, is compelling, see note 4 *infra,* we cannot say with reasonable confidence that the "scientific" homing in on the defendant, see note 5 *infra,* did not

defendant might be entitled would be a remand to the Superior Court for a *Lavigne* hearing, with this court retaining jurisdiction to act upon the results of such hearing. Compare *Commonwealth* v. *Pyne,* 35 Mass. App. Ct. 36, 40 (1993). In the circumstances of this case, however, the record provides more than adequate basis for us to apply the *Lavigne* criteria, rendering remand unnecessary as wasteful of judicial resources.

We conclude that had an adversary hearing been conducted by the Superior Court judge and the *Lavigne* criteria applied, approval of the request for the taking of the defendant's blood was inevitable or "certain as a practical matter." *Commonwealth* v. *O'Connor,* 406 Mass. 112, 117 (1989). See *Commonwealth* v. *Beldotti,* 409 Mass. 553, 557-559 (1991).[3] Certainly no taint of bad faith acceleration of discovery by the police is present here. There is no suggestion that the detention of the defendant in Plymouth County was a "device to obtain evidence of a crime." *Commonwealth* v. *O'Connor, supra* at 118. See also 5 LaFave, Search and Seizure § 11.4(a), at 245 (3d ed. 1996). Nor was there any undercutting of the principles requiring the obtaining of a search warrant. See *Commonwealth* v. *Benoit,* 382 Mass. 210, 218-219 (1981). The prosecution not only exposed its interest in obtaining a blood sample to the scrutiny of a grand jury but also petitioned the Superior Court, presenting the judge with the same quality and quantity of information as would pertain to a search warrant application. A similar process utilizing a judicial order to implement a grand jury request rather than a search warrant had been reviewed without negative comment in the most recent relevant appellate decision preceding the prosecution of this case. See *Commonwealth* v. *Downey,* 407 Mass. 472, 474-477 (1990). See also *Matter of an Investigation into the Death of Abe A.,* 56 N.Y.2d at 294 ("Nomenclature notwithstanding, if the application and the relief comport with all the requisites of a search warrant, it may be taken for what it is . . .").

---

contribute to the verdict and would, therefore, make any error harmless. See *Commonwealth* v. *Gibson,* 424 Mass. 242, 245-246 (1997).

[3]Our level of certitude obviates the necessity of any attempt to solve the "semantic puzzle" presented by the issue of proof in inevitable discovery cases. Compare *United States* v. *Cabassa,* 62 F.3d 470, 474 (2d Cir. 1995), with *Commonwealth* v. *O'Connor, supra* at 117.

We turn to the *Lavigne* criteria which we apply as of the time of the order to extract blood. The defendant freely concedes the first requirement — that probable cause existed at that time to believe the defendant had committed the crimes in question. That the crimes are extremely serious is beyond dispute, as is the importance and relevance of the crime scene physical evidence and the blood sample. When the extraction order was sought, the evidence pointing to the defendant consisted largely of the resembling composite, information that both the defendant and the assailant carried a kitchen knife, and the photo identifications by the victim and a person who, one week before the crimes, had been approached at his front door by a man asking for "Karen" as had a neighbor of the victim on the night of the crimes.[4] This inculpatory, but not overwhelming, evidence stood to be considerably enhanced by expert blood serology testing, which can place a suspect within a category of persons who could have committed the crime or can exculpate him by placing him outside that category. Given the potential persuasive force of such scientific evidence,[5] its importance to the investigation cannot be gainsaid.

Read literally, the *Lavigne* decision requires that a judge consider the availability of less intrusive means of obtaining blood from a suspect. Viewed more broadly, the standard calls for a determination whether evidence, other than blood, but of equivalent value to the investigation, can be obtained by less invasive methods. The defendant, in his memorandum in support of his motion to suppress, argued that the taking of blood was "overly intrusive and conducted in an unreasonable manner." The physician who drew the defendant's blood testified at the suppression hearing that he used a "sterile technique" employing a disposable needle and that the proce-

[4]The eyewitness evidence became far more compelling at trial when augmented by in-court identifications of the defendant by the victim and two of her neighbors and evidence of his having been identified by them at a pretrial lineup. One of those neighbors lived two houses from the victim and had been asked by a man at the front door approximately an hour before the crimes whether a named party lived there. The other, who lived next door to the victim, had been approached in similar fashion at approximately the same time. There also was evidence that the assailant wielded the knife with his left hand and that the defendant is left-handed.

[5]At trial, an expert placed the defendant within a category of nine-tenths of one percent of the population who could have committed the crimes.

dure is safe and simple. Although drawing of blood with a needle undoubtedly is intrusive, it has long been recognized as "commonplace" and "routine in our everyday life," *Schmerber* v. *California,* 384 U.S. 757, 771 & n.13 (1966), and the intrusion as "relatively minor," *Commonwealth* v. *Trigones,* 397 Mass. 633, 640-641 (1986). The defendant makes no claim of the existence of a less intrusive means of obtaining blood. Instead, he focuses on evidence that he had collapsed veins and that the physician experienced difficulty drawing blood from the defendant's arms and obtained it from one of his legs. He does not, however, quarrel with the judge's findings that the defendant was read "his Miranda rights" and "did not object to or discourage the testing" and that "[t]he test was performed . . . in accordance with accepted medical practice . . . ." Neither at the suppression hearing nor in argument to us does the defendant suggest that he suffered from any condition that placed him peculiarly at risk from the blood test. He also does not contest the physician's testimony at the suppression hearing that the sterility of the employed technique rather than the test locus is the most important factor in the safety of the blood test. Compare *Schmerber* v. *California,* 384 U.S. at 771-772; *Winston* v. *Lee,* 470 U.S. 753, 761 (1985). It is significant that not only did the defendant not object to the blood test at the time it was performed, unlike the defendant in *Lavigne* who objected immediately after the blood extraction, but also that there is no record evidence of his objecting until he filed a motion to suppress seventeen months later. See *Commonwealth* v. *Miles,* 420 Mass. 67, 84 (1995).

The defendant also argues that evidence other than blood, such as hair samples, could have been obtained from him by non-intrusive means and used to support the introduction of deoxyribonucleic acid (DNA) comparison evidence. This argument ignores not only the separate persuasive quality of blood serology evidence, but also the fact that, as of the time of the trial in April, 1994, no Massachusetts appellate court had permitted the introduction of DNA evidence. See *Commonwealth* v. *Curnin,* 409 Mass. 218 (1991); *Commonwealth*

v. *Lanigan,* 413 Mass. 154 (1992); *Commonwealth* v. *Daggett,* 416 Mass. 347, 348-353 (1993).[6]

We conclude that any reasonable weighing of the evidence relative to the seriousness of the crimes, the importance of the blood test to the investigation, and the unavailability of less intrusive means of obtaining equivalent proof against the defendant's right to be free from bodily intrusion inevitably will tip the balance in favor of the relatively minor intrusion here involved, especially in light of the ongoing grand jury investigation and the fact of the defendant's detention on an unrelated matter. "It bears repeating, however, that we reach this judgment only on the facts of the present record," *Schmerber* v. *California,* 384 U.S. at 772, and that, in the peculiar circumstances here presented and not likely to be duplicated in cases arising after *Matter of Lavigne,* the deterrent purposes of the exclusionary rule hardly would be served by an unjustified and wasteful remand. Compare *Brown* v. *Illinois,* 422 U.S. 590, 608-609 (1975) (Powell, J., concurring); *Commonwealth* v. *Beldotti,* 409 Mass. at 559.

*Judgments affirmed.*

---

[6]The prosecution did, in fact, obtain DNA evidence, but a motion to preclude its use was allowed by the trial judge, who relied on the then current state of appellate decisions. At an earlier hearing before another judge, who denied a motion to suppress DNA evidence which in effect linked the defendant to the crimes, experts for the Commonwealth testified that the chance of a coincidental match was one in 12,500 or one in 12,635, while an expert for the defendant indicated that the chance of a coincidental match was one in 11,500. *Commonwealth* v. *Lanigan,* 419 Mass. 15 (1994) (*Lanigan II*), permitting the introduction of DNA evidence was decided after the trial of this case.