## COMMONWEALTH *vs.* CARL ODWARE.

Essex. February 2, 1999. - March 18, 1999.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, & IRELAND, JJ.

*Identification. Evidence,* Identification, Photograph. *Due Process of Law,*
   Identification. *Practice, Criminal,* Instructions to jury, Argument by
   prosecutor, Capital case. *Constitutional Law,* Confrontation of witnesses.

At the trial of an indictment for murder in the first degree, the defendant did
   not demonstrate that the circumstances surrounding witnesses' viewing a
   police flyer with the defendant's photograph on it were attributable to
   police conduct, i.e., were an unnecessarily suggestive identification
   procedure, or that the witnesses' subsequent in-court and out-of-court
   identifications of the defendant should be suppressed as unfair. [235-236]
At the trial of a murder indictment, the judge erred in not instructing the jury
   on the possibility of the witnesses' good faith, honest, but mistaken,
   identification of the defendant; however, the error was not prejudicial, nor
   did it create a substantial likelihood of a miscarriage of justice where,
   given the overwhelming evidence against the defendant, the jury would not
   have reached a different result had they been given the instruction.
   [236-237]
At the trial of a murder indictment, the judge properly limited a witness's
   testimony on redirect by the Commonwealth to the mere fact that another
   subsequent identification had been made by a nontestifying witness who
   had initially identified another person in an array in which the defendant's
   photograph did not appear, and the defendant was not prejudiced by such
   limitation. [238]
At the trial of a murder indictment, nothing in the prosecutor's closing argu-
   ment warranted reversal or the grant of a new trial. [238-239]

INDICTMENTS found and returned in the Superior Court Depart-
ment on April 19, 1995.

A pretrial motion to suppress evidence was heard by *Joseph
A. Grasso, Jr.,* J., and the cases were tried before *Richard E.
Welch, III,* J.

*Gail S. Strassfeld* for the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Com-
monwealth.

IRELAND, J. A jury convicted the defendant of murder in the

first degree, armed assault with intent to murder, and assault and battery by means of a dangerous weapon. Represented by new counsel on appeal, the defendant claims error in (1) the denial of his motion to suppress certain eyewitness testimony; (2) certain jury instructions; (3) the admission of the testimony of a police officer that a nontestifying witness selected a photograph from a photographic array; and (4) remarks made by the prosecutor during his closing argument. We reject these arguments and discern no reason to exercise our authority pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the jury's murder verdict. Accordingly, we affirm the defendant's convictions.

The jury were warranted in finding the following facts. On February 14, 1994, the defendant shot two men outside a pizza restaurant in Lynn. The first man died from gunshot wounds to his head and chest, and the second survived. The victims were among a large group of young people who were gathered inside and outside the restaurant. Five young men were standing together in front of the restaurant when they noticed the defendant across the street gesturing to them. They crossed the street, spoke to the defendant, and then went inside the restaurant. About two minutes later, the defendant entered the restaurant and gestured for one of the five men to follow him outside. The entire group went outside. Within seconds, the defendant pulled out a gun and pointed it at the group, then fired several shots, killing one victim, and wounding the second victim. The defendant fled, firing one last shot at the group as he retreated. He returned to his apartment where he was seen by a neighbor and his girl friend's sister, with whom he shared an apartment. He later sent his roommate to the police to learn what was happening.

The defendant was not apprehended for more than one year. According to the Commonwealth, on March 28, 1995, he telephoned one of the police investigators and told him that the police were "too stupid to catch him" and that he would "burn [them] up in court." He was arrested in Boston two days later. Once in custody, the defendant gave statements to the police in which he acknowledged having clothing similar to the shooter's, owning a gun of the same caliber as the gun fired,[1] and being in the vicinity of the shootings when they occurred. At trial, the jury heard an audiotape and read the accompanying transcript

---

[1]The murder weapon was never found.

of both an edited version of his statement to police and the telephone call to the police two days prior to his arrest.

The Commonwealth's case depended on the testimony of several witnesses who were in and around the restaurant that afternoon, some of whom later identified the defendant as the shooter from photographic arrays and lineups. Sean Duarte saw the defendant repeatedly on the day of the shootings. He was an eyewitness to the shootings, and later identified the defendant from a photographic array and at the grand jury lineup. Other witnesses saw the defendant at the restaurant, but did not see the shootings. Stephen Powell recognized the defendant when he saw him enter the restaurant because he had played basketball with him a couple of times. Powell later identified the defendant from a photographic array. Jadi Lin Graciale, like Powell, saw the defendant as he entered the restaurant to call the group outside. She also identified the defendant at the grand jury lineup. Corey Jordan saw the defendant from his seat in the restaurant, although Jordan could not conclusively identify the defendant in a photographic array or at the lineup. Other witnesses who were not at the restaurant saw the defendant that afternoon. These included Robert Jackson, a pedestrian who heard the shootings and then saw the defendant near the restaurant putting a gun "into his pants"; Frances Teague, who heard the gunshots from her porch and then saw the defendant run past her home as he rushed from the shootings; Mary Sue Eaton, the defendant's roommate who observed his nervous behavior after he returned from the shootings and whom the defendant later forced to go to the police to find out "what was going on"; and Sophia Poe Turner and Arlene Robinson, the defendant's neighbors who saw the defendant just after the shootings.

The police investigation focused on numerous suspects, including the defendant. The police prepared separate photographic arrays for four of the suspects. One array (GQ array) contained the photograph of a suspect known as "GQ," and one contained the defendant's photograph (Hardaway [an alias] array). Investigators also created a flyer containing the defendant's photograph, which they obtained from a Lynn police department mugshot that was on file from an earlier, unrelated arrest. The flyer was intended for intradepartmental use only. Three days after the shootings, however, Bernard Robinson, a friend of the victims, obtained a copy of the flyer when he was in the

police station for an unrelated arrest. Robinson showed the flyer to several of the witnesses at the murder victim's wake and funeral. The Hardaway array and the flyer contained the same photograph.

1. *Suppression of identification evidence.* The defendant moved to suppress the testimony of six witnesses, arguing that their testimony was tainted by exposure to the flyer. After an evidentiary hearing, the motion judge suppressed the testimony of one of the six contested witnesses. The defendant argues on appeal that the in-court and out-of-court identifications made by two of these witnesses, Duarte and Graciale, also should have been suppressed because they saw the flyer containing the defendant's photograph prior to making their identifications. The defendant urges us to conclude that viewing the flyer was unnecessarily suggestive, that the Commonwealth failed to demonstrate an independent basis for the identifications, and that admission of the identifications was prejudicial.

(a) *Duarte's identification.* On the day of the shootings, Duarte was among the group of five men, and witnessed a man gesture to them from across the street. Duarte crossed the street with the group and stood facing the man from about two feet away for about ten seconds. He saw him jogging away from the group moments later. He also saw the man enter the restaurant to call the group outside, just prior to the shootings, and stood outside facing him prior to, and during, the shootings. Soon after the shootings, Duarte gave the police a description of the shooter.

Duarte attended the victim's wake and funeral, where he first saw the flyer and noted that it "really looks like" the shooter. On February 20, 1994, Duarte picked GQ as the shooter from the GQ array. On March 9, 1994, after viewing the GQ and Hardaway arrays, he chose the defendant as the shooter and disavowed his earlier identification of GQ. In April, 1995, Duarte identified the defendant at a grand jury lineup.

(b) *Graciale's identification.* On the day of the shootings, Graciale saw a man enter the restaurant from a short distance away. She gave the police a description of him shortly afterward, and then viewed photographs at the police station without making an identification. At the victim's wake, she saw the defendant's photograph in the flyer and told Robinson that it was the man she saw on the day of the shootings. Her only identification of the defendant took place at the grand jury

lineup in April, 1995, fourteen months after she saw the flyer. The motion judge concluded that her identification of the defendant "was based solely upon her observations of him at [the restaurant], not from the brief period she had seen his picture on the flyer."

(c) *Discussion.* Where a defendant alleges that witness identifications arise from unnecessarily suggestive circumstances, the "defendant has the burden to prove, by a preponderance of the evidence, that the witness was subjected by the State to a pretrial confrontation . . . 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." *Commonwealth* v. *Otsuki,* 411 Mass. 218, 232 (1991), quoting *Commonwealth* v. *Venios,* 378 Mass. 24, 26-27 (1979). The judge, in considering whether identification testimony should be suppressed, must examine "the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive." *Commonwealth* v. *Otsuki, supra* at 232-233. If a defendant establishes that a confrontation was unnecessarily suggestive, then the identifications are excluded based on due process rights guaranteed by art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Johnson,* 420 Mass. 458, 462-465 (1995); *Commonwealth* v. *Botelho,* 369 Mass. 860, 865-869 (1976). Subsequent identifications are admissible only if the Commonwealth demonstrates by clear and convincing evidence that the identifications have an independent source. See *Commonwealth* v. *Johnson, supra* at 463, citing *Commonwealth* v. *Botelho, supra* at 868.

Common-law principles of fairness are another basis to exclude witness identification testimony. See *Commonwealth* v. *Jones,* 423 Mass. 99, 109 (1996). In *Jones,* the witness saw the defendant only briefly at the time of the identification. Prior to the identification and without assistance from the Commonwealth, the witness saw the defendant shackled to a co-defendant in court for more than one hour. See *id.* at 102-103. We concluded that "[c]ommon law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances" should be excluded. *Id.* at 109.

In this case, the motion judge properly concluded that due process does not require suppression of the identifications because the defendant failed to demonstrate by a preponderance of the evidence that the circumstances surrounding the flyer

were unnecessarily suggestive. Duarte's viewing of the flyer, which occurred at either the wake or the funeral, did not result from "police contrivance or bungling." *Id.* at 104 n.5. Where the suggestive circumstances do not arise from police activity, due process does not require exclusion of subsequent identification testimony. See *Commonwealth* v. *Andrews*, 427 Mass. 434, 438 (1998); *Commonwealth* v. *Otsuki, supra* at 234.

Neither does a common-law notion of fairness weigh in favor of suppression. Indeed, in some circumstances an identification that has been tainted, but not by the government, may become so unreliable that its introduction into evidence is unfair. That did not happen here. Duarte saw the defendant multiple times, as the group gathered in front of the restaurant, as the defendant met the group face-to-face, and again from a short distance when the defendant shot the victims. Given his repeated opportunities to see the defendant, there is nothing unfair about Duarte identifying the defendant from a photographic array and at the grand jury lineup after he saw the defendant's photograph in the flyer.

We reach the same conclusion on the admission of Graciale's identification. Due process does not require suppression of her testimony because, as with Duarte's identification, Graciale's viewing of the flyer did not result from police activity. Nor is there a common-law basis to exclude her identification of the defendant at the grand jury lineup because whatever impact the flyer may have had was minimized because the lineup occurred more than fourteen months after she viewed the flyer.

The jury were in a position to make an informed assessment of whether the identifications were right or wrong because both Duarte and Graciale were subject to extensive and thorough cross-examination at trial as to their identifications.[2] "The degree of suggestiveness present in [these] identification[s] went to the weight, not the admissibility, of this evidence and it is for the jury to assess the infirmities of [these] identification[s]." *Commonwealth* v. *Melvin*, 399 Mass. 201, 208 (1987), and cases cited.

2. *Jury instructions.* The defendant argues that the judge erred by refusing to give the jury an instruction on the possibil-

---

[2]Defense counsel aggressively attempted to undermine both the credibility of Duarte and Graciale and the reliability of their identifications. Cross-examinations and recross-examinations of the two witnesses combined for 167 pages of the trial transcript.

ity that the witnesses made a good faith error in identifying him. See *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983).

We remain convinced of the importance of.a *Pressley* instruction. See *Commonwealth* v. *Rosado*, 428 Mass. 76, 78-79 (1998) (reaffirming importance of *Pressley* instruction); *Commonwealth* v. *Ashley*, 427 Mass. 620, 628-629 (1998) (same); *Commonwealth* v. *Jones*, *supra* at 110 (same). "Fairness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it." *Commonwealth* v. *Pressley*, *supra*. The instruction was requested by the defendant and was appropriate here. Mistaken identification was part of the defendant's case, and was argued to the jury in his opening and closing arguments. The judge, therefore, erred by not providing the requested instruction.

When a judge ignores the defendant's request for a good faith error instruction, the question is whether the omission prejudiced the defendant. As we recently noted, "the error in omitting the *Pressley* instruction may on occasion, like any error, be nonprejudicial." *Commonwealth* v. *Rosado*, *supra* at 79 n.1. Omitting the requested instruction is "nonprejudicial only if the Commonwealth can convince us with 'fair assurance' that that failure did not 'substantially sway[]' the outcome of the case." *Id.* at 80, quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

Failure to provide a good faith instruction in a capital case also must be examined under G. L. c. 278, § 33E. See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). Where an error in a jury instruction exists, "a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same." *Id.*

In this case, we see neither prejudicial error nor a substantial likelihood of a miscarriage of justice arising from the omission. Given the overwhelming evidence against the defendant, including nine witnesses who saw the defendant before, during, and after the shootings, who identified the defendant during the police investigation, and many of whom testified against him at trial, and the defendant's own statements concerning his gun, his clothing, and his whereabouts on the day of the shootings, we are convinced that the jury would not have reached a different result even if they had received a good faith instruction.

3. *Admissibility of police investigator's testimony.* At trial, a State police investigator testified on cross-examination that Ronald Johnson, an eyewitness who asserted his right not to testify at trial, identified GQ as the shooter from the GQ array. On redirect examination, the prosecutor attempted to show that Johnson made another subsequent identification of the defendant from a different array. The defendant objected on the ground that the testimony was outside the scope of redirect examination. In response to the objection, the judge prohibited the investigator from testifying as to whom Johnson selected, and only allowed the witness to acknowledge that another identification had been made.

The defendant alleges that admission of this testimony violated his rights to confrontation and cross-examination under both the State and Federal Constitutions. We disagree. The judge properly limited the testimony to protect the defendant's rights. "The defendant's right of confrontation requires the physical presence of a witness testifying against him, the witness's testimony to be under oath, the defendant's opportunity to cross examine the witness, and the jury's opportunity to observe the witness's demeanor." *Commonwealth* v. *Sanchez*, 423 Mass. 591, 596 (1996). The defendant had full opportunity to cross-examine the investigator and vigorously oppose and refute his testimony, as evidenced by his objection that significantly limited the testimony. See *Mendonza* v. *Commonwealth*, 423 Mass. 771, 785 (1996) (art. 12 and Sixth Amendment to the United States Constitution "only grant[] the right to a defendant in a criminal proceeding to confront the witness offering the declaration"). The defendant was not harmed because the investigator only testified about his own observation, not about the substance of Johnson's identification.

4. *The prosecutor's closing statement.* The defendant argues that the prosecutor in his closing statement improperly referred to facts not in evidence and misstated the evidence.

The defendant argues the prosecutor misstated the evidence when he said that Johnson had identified the defendant from the photographic array. As discussed above, the testimony at trial only established that Johnson made an identification, not whom he identified. In the challenged portion of the closing statement, the prosecutor discussed how the police learned about the suspect, GQ, and how the police compiled an array showing GQ. He stated: "[The police investigators] take this GQ and

what do they do? They do as they should. They put together arrays and follow up on it. Yeah, they get ID's. Not one person has said that's the guy. Sean Duarte, six out of ten he says. Ronald Johnson says it was him. Remember the testimony. Ronald Johnson looks at two arrays on the fifth, GQ, and says: 'Looks like him.' Then he is shown the Carl Hardaway array, and that is in evidence. He makes an ID."

These remarks were not improper because the record shows that the prosecutor's intended reference to "him" was to GQ, not the defendant. The prosecutor's statements concerning Johnson, when viewed in context, accurately reflected the evidence admitted as part of the police investigator's testimony.

The defendant also argues that the prosecutor improperly discussed Thomas's identification, which had been suppressed, and made three specific comments which amounted to either exaggerations or misleading insinuations. The prosecutor noted Powell's reluctance to testify, stated that the shootings were about "disrespect," and commented that another witness had difficulty identifying the defendant because the defendant "took off." The defendant did not object to any of these four statements at trial or ask for curative instructions. Our review, therefore, is limited to whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 354 (1998), and cases cited.

Viewed under this standard, which requires us to examine the cumulative effect of the statements, see *id.* at 351, none of the defendant's claims warrants reversal or a new trial. The comments concerning Thomas were limited properly "to the evidence and fair inferences that can be drawn from the evidence," *Commonwealth* v. *Pearce*, 427 Mass. 642, 646 (1998), quoting *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994), because the prosecutor referred to Thomas's trial testimony, not her previously suppressed identification.[3] The other comments were grounded on the evidence and were within the range of rhetoric and "excusable hyperbole" available to either side in closing argument. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997).

5. *Review under G. L. c. 278, § 33E.* The defendant argues that, even if individual errors in his trial were not substantial

---

[3]Moreover, the prosecutor had attributed Thomas's testimony to another witness.

enough to warrant reversal, the combination of errors indicates that a new trial is required. We disagree. The defendant's murder conviction, in our opinion, is supported by overwhelming evidence. We have reviewed the entire record on both the law and the facts, and we see no basis for granting a new trial or reducing the murder verdict.

*Judgments affirmed.*