Agnes, A.J.
This Memorandum of Decision deals with an issue that is common to two otherwise unrelated cases regarding the admissibility of certain out-of-court identifications that were the product of one-on-one show-up procedures arranged by the police, and alleged by the defendants to have been unnecessarily suggestive. In the first case, the defendant, Juan Delrio, is charged by indictment with assault with intent to commit murder and assault and batteiy by means of a dangerous weapon. In the second case, the defendant, Richard Pittman, is charged in an indictment with trafficking in cocaine, a Class B controlled substance, in excess of 14 grams, and other offenses based on information gathered by the Lynn Police Department as a result of a motor vehicle stop.
I. FINDINGS OF FACT IN THE DELRIO CASE
At approximately 9:45 p.m. on the evening of October 22, 2001, Patrick Ruane and Michael Stelenberger drove to 276 Washington Street. This was the home of Paola Pol who was either the current or former girlfriend of their friend Douglas Barrett. Mr. Stelenberger wanted to determine whether Ms. Pol was seeing another man. Mr. Stelenberger knocked on the front door of the large home. Paola’s sister answered the door. There was a heated exchange between her and Mr. Stelenberger. Some male occupants of the home came to the door. A physical confrontation ensued on the front porch. Mr. Ruane, by this time, had joined Mr. Stelenberger on the porch. Mr. Barrett arrived on the porch at some point, and also joined Mr. Stelenberger and Mr. Ruane in the fracas. Mr. Ruane *239 ended up in a struggle with an individual later identified as the defendant. At some point during this confrontation, Mr. Ruane felt what appeared to be a painful cramp in his abdomen. He retreated from the porch. He ran as fast as he could away from the scene. When he realized he had been stabbed, he began to search for a telephone. He entered the home of his friend, Douglas Barrett, at 183 Lafayette Street. He went inside and borrowed a cordless telephone which he brought outside with him. At some point, either while inside the house or on the street, he called the police.
Salem Police Officer Puleo, a 16-year veteran of the Salem Police Department, was working the midnight to 8:00 a.m. shift on this same night. Shortly after his shift began, he was dispatched to 276 Washington Street on a report of a fight and a stabbing. He arrived at the scene shortly after midnight, and parked his cruiser on the street. He observed 7-8 people standing on or near the front porch of the large, multifamily, three-level house at that address. He heard people yelling. He went to the side of the house facing Ropes Street. He passed over a fence and went up to the porch. There were four males there later identified as Delrio, the defendant, along with Rodriguez, Barrett, and Stelenberger. A short time later, Officers Cunningham and Doyle arrived on the scene.
Officer Puleo had a conversation with Barrett who told him that there had been a fight. Barrett indicated that he was not involved in the fight, but his friends Stelenberger and Ruane, were involved, and that he saw the defendant stab Ruane in the lower chest, and saw the defendant drop the knife and then throw it over the railing into some bushes. Stelenberger pointed out where the knife had been thrown. Officer Puleo recovered a knife from that spot.
While Officer Puleo was interviewing persons on the porch, an occupant of the home, Ms. Paola Pol, appeared and stated that her ex-boyfriend (later determined to be Douglas Barrett), had arrived at her home with his friend, Stelenberger, and started a fight with her current boyfriend (later determined to be the defendant, DelRio).
During this time, Officer Puleo heard a radio broadcast about an individual who had been stabbed and was found in the vicinity of at 183 Lafayette Street, a couple of blocks away from the scene of the incident. Officer Carter was dispatched to that scene shortly after he pulled up to 276 Washington Street. Officer Carter drove about Vi mile to the vicinity of 183 Lafayette Street where he found Ruane standing near a phone booth. He had a wound in his abdomen. He told Officer Carter that he had been in a fight “down the street.” Officer Carter told him to sit down, and then called for an ambulance. Officer Carter asked him who did it. Ruane gave a description of the stabber (a light skinned, “baby-faced," Hispanic male, with short, cropped hair, 5’ 8" or 5’ 9" tall, wearing a multi-colored, parker type jacket with gray sleeves). Ruane said he was stabbed in a fight involving his two friends (Barrett and Stelenberger) and a group of other people. He said he saw the knife in the defendant’s hand. The ambulance arrived in a few minutes.
Meanwhile, Officer Puleo received a call from Officer Carter with a description of the alleged stabber as noted above. Barrett also gave Officer Puleo a description of the stabber as an individual wearing a multicolored fleece jacket. Officer Puleo realized he was looking straight at the person who had been described by Officer Carter. Based on this information, the defendant and a companion, Rodriquez, were asked by the police to go to the area where Ruane had been found by Officers Doyle and Cunningham for a show-up identification procedure. They agreed. No physical force or threats were employed by the police to persuade them to cooperate.
When the police cruiser in which the defendant was riding arrived at the vicinity of 183 Lafayette Street, Ruane was in the back of the ambulance receiving treatment. He was alert and conscious. He had not bled very much, and his vision was not impaired. The defendant and Rodriquez were not in handcuffs. They stood outside the ambulance and about 4-5 feet from Ruane, with police officers next to them. Officer Doyle told Ruane that they had two individuals with them who were involved in the incident, and asked Ruane “Who stabbed you?” Without hesitation, Ruane pointed at the defendant and said “That’s him.” He also said Rodriquez was not involved, and he was released by the police. Officer Doyle also showed Ruane a knife that had been recovered from the scene, but he was unable to identify it as the weapon used to stab him.
II. FINDINGS OF FACT IN THE PITTMAN CASE
Ms. Carol Levesque lives with her mother and her dogs in a four-room, first-floor apartment on Lynnfield Street in Lynn. In early November 2001, someone broke into her apartment and stole her VCR, television, and cable box. She feared the robber would return so she left her lights on and tried to stay awake on the couch. During the evening of November 9,2001, while sitting on the couch in her bedroom, she fell asleep. The open doorway to this room was ahead and to the right of where she was sleeping. A sketch of the apartment showing the layout of the rooms was received in evidence (exhibit 1).
At some point, she was awakened by her dogs and looked up to see a black man standing in her bedroom doorway. He was visible from the waist up. He was facing her as if he had just walked into the room. He was wearing a knit hat, was clean shaven, and had a full face. She reacted by jumping up and shouting “Come here.” As she advanced toward this individual, he turned and ran. She pursued him through her apartment. She noticed he had a medium build, and was wearing a “goldish-tannish” color, short jacket and dark pants. At some point, he turned and began *240 to come toward her. She screamed. He came to within 8 feet. The lighting in the area was good and she was able to see him clearly. He then turned, opened her front door, and walked out. She saw him head around to the back of the house. She called the police and reported what had happened.
In one of her telephone conversations with the police, Ms. Levesque was told “don’t be nervous; I think we have someone.” Lynn Police Officers Folan and Gosca arrived a short time later. She was acting in a hysterical manner — crying and upset. About this time, her neighbor, Mr. Paul Carter, who has since become a member of the Beverly Police Department, appeared outside and asked “are you looking for a black guy who jumped over the fence?” A sort time later, officer Folan asked Ms. Levesque and officer Carter if they would take a ride with the police because “we’ve got someone for you to look at; someone matching your description.” She agreed and took a ride in a police cruiser.
It turns out that Officer Carter also had an encounter with a black man in the neighborhood that evening. On the night in question, Officer Carter was employed by the Town of Beverly as the animal control officer. He arrived home that night at about 1:00 a.m. As he was entering his home, he noticed a black man walking through an adjacent parking lot. The individual had on blue jeans and a flannel type shirt. Mr. Carter entered his apartment. He exited about five minutes later to take his dogs for a walk. He followed his usual route. As he was walking through the parking lot adjacent to his property, he saw the man he had seen before peering over his fence from inside his back yard. Mr. Carter ran around to a position where he would be able to see inside of his yard and came within 5-6 feet of the individual. Carter asked him what he was doing. The man said “I was just taking a leak in your yard.” Carter said, “you’re trespassing” and walked past the man into his back yard.
After Officer Carter checked his yard and home for damage, he heard a police cruiser in the area. He walked over to the home of Ms. Levesque where the cruiser had pulled up and asked if the police were looking for anyone in particular. He told the officer about what had happened with the man in his backyard. The officer told him a vehicle had been stopped, and they had someone who fit the general description given by Carter. The police asked him if he would look at someone. Officer Carter agreed, and he along with Ms. Levesque rode a short distance in a police cruiser to the location where a vehicle had been stopped by the police. Ms. Levesque road in the front seat of the cruiser and Officer Carter rode in the back seat.
As the police cruiser turned the corner on to Ford Street where the suspects’ car was stopped and without any prompting from anyone, Ms. Levesque exclaimed “that’s him; that’s the guy right there,” pointing to the defendant. Officer Folan said he wanted them to get a good look at the suspects’ faces so he pulled the cruiser to within about 20 feet of where the defendant and a second individual were standing outside the Lincoln Town Car they had been riding in. Ms. Levesque was asked, “Can you identify who was in your house?” She pointed to the defendant and said he was the man who had accosted her in her home, and was dressed the same way he had been when she saw him in her house. She did not identify the other individual who also was a black male.
Earlier that evening, another Lynn Police Officer, Stephen Emory, was returning to his home on Caudry Avenue after having worked the 5:00 p.m. to 1:00 a.m. shift. At approximately 1:00 a.m., he saw a black man, wearing a gold or light brown jacket and jeans, who he did not recognize, coming from the area of his street. Officer Emory had lived in the area his whole life, and knew his neighbors. He also saw a neighbor, Officer Carter, following this man. He then saw Carter and this black man “go their separate ways.” Officer Emory called the Lynn Police Department on his cell phone to request a cruiser to the area. Shortly thereafter, he heard a police radio broadcast directing a cruiser to respond to 22 Lynnfield Street for a suspected breaking and entering. That address is only three houses away from his house. Officer Emory decided to follow the black male.
He parked his cruiser in a nearby 7/11 store parking lot, and turned off the engine and his lights. The suspect was out of his sight for no more than 10 seconds as he proceeded to leave the area. As the suspect walked past at a distance of about 40 feet, he looked at Officer Emory. The suspect walked toward and entered a Lincoln Town Car which was parked on Parkland Avenue. There was one other person in this vehicle. Officer Emory followed this vehicle in his cruiser as it proceeded along Parkland Avenue, Richardson Road and Broadway heading toward Boston Street. Officer Emory was in contact with the Lynn Police dispatcher and kept the dispatcher informed of the location of the suspect vehicle. When the suspect vehicle turned on to Ford Street, several Lynn Police cruisers converged on the scene and stopped it. Officer Emory pointed out the passenger (who later was identified as the defendant) as the person he had seen earlier that evening in the vicinity of 22 Lynnfield Street.
The occupants of the car were detained until the witnesses could be brought to the scene for an identification procedure.
III. RULINGS OF LAW
1. Analytical Framework Governing Pretrial Identification Procedures
“There is no question that the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primary cause of erroneous convictions.” Commonwealth v. Johnson, 420 Mass. 458, 465 (1995).)[1] Accord, Commonwealth v. Jones, 423 Mass. 99, 109 (1996) (“Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases *241 the chance of a conviction of an innocent defendant”). See also Commonwealth v. Francis, 390 Mass. 89, 100 (1983) (“One of the most troublesome problems in the administration of criminal justice is the possibility that eyewitness identification testimony is wrong, given by a witness who sincerely but wrongly believes in the accuracy of his or her identification”). Unlike evidence seized in violation of the rules governing searches and seizures, or at least some statements obtained in violation of the Miranda doctrine, mistaken identification evidence jeopardizes the ability of the factfinder to perform its role at trial and diminishes the value of the trial process. Commonwealth v. Johnson, supra, 420 Mass. at 470, quoting People v. Adams, 53 N.Y.2d 241, 250-51 (1981).
One of the identification procedures that presents the greatest risk of mistaken identification is the one-on-one show-up in which a single suspect (or in some cases several suspects), usually in the company of law enforcement personnel, are presented to the victim of a crime shortly after its commission in an effort to confirm or dispel the suspicion by the police that they have identified the assailant."[2] One-on-one show ups are not favored because they are inherently suggestive. Id at 461. However, under Massachusetts law, such procedures are not per se unlawful. Id, A one-on-one show-up conducted shortly after the crime is not constitutionally infirm unless the defendant establishes, by a preponderance of the evidence, that the procedure was “so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant due process of law.” Commonwealth v. Odware, 429 Mass. 231, 235 (1999) (citation omitted). See also Commonwealth v. Austin, 421 Mass. 357, 361 (1995); Commonwealth v. Storey, 378 Mass. 312, 317 (1979), cert denied, 446 U.S. 955 (1980) (“Although such confrontations pose particularly serious dangers of suggestiveness, we would consider it ill advised to exclude as constitutionally unacceptable all evidence that has been derived from single person confrontations simply because these identification procedures might have taken place just as easily in the form of lineups”).[3] The determination of whether the identification procedure was unnecessarily suggestive requires the judge to examine the totality of the circumstances. Commonwealth v. Santos, 402 Mass. 775, 781 (1988). “This has been understood to refer to the episode itself; it does not extend to a consideration of the witness’s entire connection with the case to determine whether the confrontation, although set up in such a way as to be unnecessarily suggestive, was nevertheless reliable, and therefore usable — for example, because the witness had a clear perception of the offender and would not be misled by a one-on-one confrontation or the like.” Commonwealth v. Botelho, 369 Mass. 860, 867 (1976). See generally K.B. Smith, Criminal Practice & Procedure §447 (2d ed. 1983 & Sup. 2001) (collecting cases). By contrast, in the federal system and under the law in most other jurisdictions, the analytical linchpin in such cases is simply whether the witness’s identification was reliable. See W.R. LaFave, J.H. Israel, & N.J. King, 2 Crim-
inal Procedure §7.4(c) (West Pub. 1999). This point was underscored in Commonwealthv. Johnson, suprawhere the Supreme Judicial Court rejected the test adopted by the United States Supreme Court in Manson v. Braithwa-ite, 432 U.S. 98 (1977), in favor of a rule of per se exclusion for unnecessarily suggestive identification procedures that create a risk of mistaken identification regardless of any circumstantial guarantees of reliability. “(A]rt. 12 requires the application of the stricter per se approach described in Commonwealth v. Botelho, supra . . . The ‘reliability test’ is unacceptable because it provides little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications and, ultimately, from wrongful convictions.” Commonwealth v. Johnson, supra 420 Mass, at 465, 466.[4] See Commonwealth v. Thomley, 406 Mass. 96,100 n. 3 (1989). Despite the vigorous dissent of three justices in Commonwealth v. Johnson supra where it was noted that the Braithwaite reliability standard is the rule in almost eveiy other jurisdiction, Commonwealth v. Johnson supra 420 Mass, at 477 (Greaney, J. dissenting), the criteria outlined in Braithwaite have been shown to be deficient on numerous grounds. See Wells et al., “Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 Law and Human Behavior 1, 24 (1998).
Determining whether a show-up is unnecessarily suggestive must include an inquiry into whether good reason existed for the use of the show-up. Commonwealth v. Austin 421 Mass. 357, 361 (1995).[5] Factors relevant to this inquiry include: the need for efficient police investigation immediately following a crime, and the usefulness of prompt confirmation of the investigatory information. Id. at 362. Efficient investigation in the immediate aftermath of a crime may result in freeing the innocent suspect and allow the police to pursue other leads. Commonwealth v. Santos, 402 Mass. 775, 784 (1988). “A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track.” Commonwealth v. Harris, 395 Mass. 296, 299 (1985) (quotation omitted). “The analysis cannot be generalized. Each case must be resolved on its own peculiar facts ...” Commonwealth v. Austin 421 Mass. 357, 362 (1995). The principal consideration, however, is the conduct of the police who arrange the show-up procedure.
In Commonwealth v. Odware, supra, the Supreme Judicial Court cited Commonwealth v. Johnson, supra, as an example of an unnecessarily suggestive show-up procedure. In Johnson the victim had previously failed to pick out a suspect in two, separate identification procedures (a photo array and a lineup). The victim described his assailants as a black male and a white female with a limp. There was only one black male and white female who had a limp in the group exhibited to the victim. As the Court noted, “(t]he showup employed *242 by the police in this case was conducted eighteen hours after the crime. It took place in the area of the housing project where Goncalves [the victim] had seen his assailants drive the previous night; the defendant was brought forward from the group before Goncalves positively identified him; and the defendant was wearing clothes similar to those worn by the male assailant. Based on these facts, the judge was warranted in concluding that the identification procedure was unnecessarily suggestive.” Commonwealth v. Johnson, 420 Mass. at 461. See also Commonwealth v. Cruz, 10 Mass. L. Rptr. 327 (Mass. Super. 1999) (“|T]he police incorrectly told the rape victim, before she identified the three suspects, that they had been caught fleeing the crime scene. She testified that, when she first observed the three suspects they were lying face down on the ground handcuffed and shackled. Having been told they were caught fleeing, she ran, in a rage, from the ambulance to where they were lying and kicked one of the defendants in the head. She was then urged by one of the police to do it again.”).
2.Proposals to Address the Problem of Unnecessarily Suggestive Identification Procedures
The attention that eyewitness identification procedures have received in recent years in court decisions and academic writings, as well as in the popular press, led the United States Department of Justice to undertake a comprehensive review of the well documented problems, and to propose a systematic reform. In 1998, then Attorney General Janet Reno, called for the development of national guidelines for the collection of eyewitness evidence. A panel was formed under the auspices of the National Institute of Justice. Eventually a Working Group was established that included researchers in the field of eyewitness identification procedure, fourteen law enforcement persons (from thirteen different states), four prosecutors, and three defense lawyers. This group produced a consensus document that was approved by Attorney General Reno and published by the United States Department of Justice in October 1999. The 55-page report is entitled Eyewitness Evidence: A Guide for Law Enforcement (“Guide”).[6] The report is accompanied by a Message from the Attorney General in which she stated that “in developing its eyewitness evidence procedures, every jurisdiction should give careful consideration to the recommendations in this Guide and to its own unique local conditions and logistical circumstances. Although factors that vary among investigations, including the nature and quality of other evidence and whether a witness is also a victim of the crime, may call for different approaches or even preclude the use of certain procedures described in the Guide, consideration of the Guide’s recommendations may be invaluable to a jurisdiction shaping its own protocols. As such, Eyewitness Evidence: A Guide for Law Enforcement is an important tool for refining investigative practices dealing with this evidence as we continue our search for truth.” Guide, at iii-iv (NIJ, Oct. 1999).
The Guide is not in the form of a procedural rule that purports to define every circumstance in which a one-on-one identification procedure is or is not justified. Instead, it is a guideline which suggests an approach to identification procedures that avoids suggestive police practices, and which provides law enforcement personnel with flexibility to make a judgment about whether “circumstances require the prompt display of a single suspect to a witness.” Guide, Section IV, Principle. The Guide also contains a series of simple steps the police should follow to avoid or at least to minimize the suggestiveness associated with such procedures, as follows:
Procedure: When conducting a showup, the investigator should:
1. Determine and document, prior to the showup, a description of the perpetrator.
2. Consider transporting the witness to the location of the detained suspect to limit the legal impact of the suspect’s detention.
3. When multiple witnesses are involved:
a. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses.
b. If a positive identification is obtained from one witness, consider using other identification procedures (e.g., lineup, photo array) for remaining witnesses.
4. Caution the witness that the person he/she is looking at may or may not be the perpetrator.
5. Obtain and document a statement of certainty for both identifications and nonidentifications.[7]
The Guide is not only suitable for use as instructional material in recruit and in service police training programs throughout the Commonwealth, but also should be considered by the police agencies and departments in the development of policy standards.[8]
3.The Legal issues in the DelRio Case.
In this case, the show-up took place within minutes of the stabbing, and the suspects were brought to the location where the victim had been found. See Commonwealth v. Austin, 421 Mass. 357, 361-62 (1995). The police conducted interviews with persons at the scene, and documented a description of the assailant before the show-up took place. The police brought both suspects to the scene. However, instead of simply asking the victim if he could identify one or both of the two individuals, Officer Doyle told the victim that they had two individuals who were “involved” in the incident. He then compounded this suggestive remark with a further suggestive remark by asking the victim ‘Who stabbed you?”[9]
Officer Doyle’s statement that the two individuals to be viewed were involved in the fight was obviously suggestive, and should not have been made. See Commonwealth v. Hicks, 17 Mass.App.Ct. 574, 583 (1984); Commonwealth v. Coy, 10 Mass.App.Ct. 367, 374 (1980). See also Guide, Section IV, Procedure 4 (“Caution the witness that the person he/she is looking at *243 may or may not be the perpetrator”). Simply because a victim is told by the police that someone matching the victim’s description has been apprehended does not make the show-up unnecessarily suggestive. Commonwealth v. Harris, 395 Mass. 296, 299 (1985) (“The police officer’s statement to the victim that they would be bringing someone in who matched the description she had given was not so suggestive as to make the confrontation unfair”). However, the additional remark by Officer Doyle in this case was tantamount to a statement that one of these two suspects was the stabber. Short of pointing to the defendant or singling him out in some way, what else could the police have done to suggest to the victim that he was the stabber?
There is also reason in this case to question why a show-up was conducted at all. The police had ample probable cause to arrest the defendant on the basis of the identification given by a witness at the scene and a physical description from the victim that fit the defendant. There is no evidence to suggest that there was any confusion or uncertainty about who the stabber was before the show-up was conducted.
In response, it might be pointed out that the police had good reason to believe that the defendant was the stabber before they exhibited him to the victim based on the reports from other witnesses and the physical description supplied by the victim. And it could be added that the victim had an excellent opportunity to view his attacker at the time of the incident.[10] But to consider such factors is to engage in precisely the type of analysis of reliability that the Supreme Judicial Court held in Commonwealth v. Botelho, supra, and Commonwealth v. Johnson, supra, is not permitted under Article 12 of the Declaration of Rights. Unless and until there is a change in the law, we are required to apply a per se test, and to exclude identification evidence obtained by means of unnecessarily suggestive procedures such as those employed in this case.
For these reasons, the defendant has met his burden of demonstrating that the identification procedure was unnecessarily suggestive, and the out of court identification by the victim must be suppressed.
Notwithstanding the suppression of the identification following the show-up, the witness should be permitted to make an in court identification based on the doctrine of independent source. Here, the Commonwealth met its burden of proving by a standard of clear and convincing evidence that an in court identification by Ruane would be based on a source independent of any suggestive confrontation. See Commonwealth v. Botelho, 369 Mass. 860, 868 (1976). The victim made his observations during an encounter in which the defendant was close to him. He had a good opportunity to view the defendant and gave an accurate physical description of his assailant. See Commonwealth v. Bodden, 391 Mass. 356, 361 (1984).
4. The Legal Issues in the Pittman Case. A. The Motor Vehicle Stop
The police certainly had justification for a stop of the Lincoln Town Car based on reasonable grounds to believe that the person seen entering that car by Officer Emoiy was the same person observed by Officer Cotter and Ms. Levesque earlier that evening. See Commonwealth v. Barros, 425 Mass. 572, 584 (1997), and cases cited.
B. The Identification Procedure
In the Pittman case, the police brought two potential eyewitnesses to the scene for an identification procedure. As in the DelRio, case, the police had good cause to conduct a show-up identification procedure. They were aware that the victim had encountered the intruder in her home only a short time earlier. The show-up took place within minutes of the arrival of the police. See Commonwealth v. Austin, 421 Mass. 357, 361-62 (1995). The police interviewed the victim and documented her description of the assailant before the show-up took place. The police brought both suspects to the scene. However, the police again made inappropriate comments before the identification procedure. For example, Officer Folan asked Ms. Levesque and Officer Carter if they would take a ride with the police because “we’ve got someone for you to look at; someone matching your description.” Although this comment was suggestive, it was not fatal for the reasons explained in Commonwealth v. Harris, supra.
Without any prompting, Ms. Levesque exclaimed that the defendant was the man who had entered her home even before the cruiser in which she was riding had stopped, and before any questioning by the police. She confirmed her identification when she approached closer to the defendant. The police did not prompt the witnesses in any way, or make any additional suggestive comments. The police asked Ms. Levesque to take her time and take a good look at the man she had identified. Ms. Levesque did so and repeated her identification.
The flaw in this procedure (apart from the suggestive comment about the suspect matching her description) was that the police permitted the second eyewitness, Officer Carter, to remain in the police cruiser during Ms. Levesque’s identification. See Guide, supra Section IV (“3. When multiple witnesses are involved: a. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses, b. If a positive identification is obtained from one witness, consider using other identification procedures (e.g., lineup, photo array) for remaining witnesses”). There was no good reason for allowing the second eyewitness to be present during the identification procedure involving the first eyewitness. The combination of suggestive remarks by the police which preceded the identification and the comments made by Ms. Levesque when she identified the defendant, are sufficient to meet the defendant’s burden of demonstrating that the identification procedure was un *244 necessarily suggestive. Thus, the out of court identification by Officer Carter must be suppressed.
The question remains of whether Officer Carter should be permitted to make an in-court identification based on the doctrine of independent source. At the hearing, he acknowledged that he had doubts about whether he could make an in-court identification of the person he saw on the night in question. Officer Carter had only a brief opportunity to view the suspect on November 9, 2001. It was dark outside and there was no additional illumination in the area where he made his observations. Although Officer Carter’s attention was drawn to the person because of the unusual circumstances in which they encountered each other, there is nothing to suggest that his attention and concentration was focused on the suspect. Under the circumstances, the Commonwealth has not met its burden of proving by a standard of clear and convincing evidence that an in-court identification by Officer Carter would be based on a source independent of any suggestive confrontation. See Commonwealth v. Botelho, 369 Mass. 860, 868 (1976).
ORDER
For the above reasons, the motion to suppress filed by defendant DelRio is ALLOWED insofar as it seeks to exclude the identification by Mr. Ruane that was the product of the unnecessarily suggestive show-up identification, but otherwise is DENIED. The Commonwealth is not prohibited from offering an in court identification if one is made by Mr. Ruane. The motion to suppress filed by defendant Pittman is ALLOWED insofar as it seeks to suppress the identification by Officer Carter that was the product of the unnecessarily suggestive show-up identification procedure, and the Commonwealth is prohibited from offering any in court identification by Officer Carter. Otherwise, with respect to the identification by Ms. Levesque, the defendant Pittman’s motion is DENIED.
APPENDIX A

Eyewitness Identification: A Guide for Law Enforcement (National Institute of Justice) (October 1999)

Section IV. Field Identification Procedure (Showup)
A. Conducting Showups
Principle: When circumstances require the prompt display of a single suspect to a witness, the inherent suggestiveness of the encounter can be minimized through the use of procedural safeguards.
Policy: The investigator shall employ procedures that avoid prejudicing the witness.
Procedure: When conducting a showup, the investigator should:
1. Determine and document, prior to the showup, a description of the perpetrator. 2. Consider transporting the witness to the location of the detained suspect to limit the legal impact of the suspect’s detention. 3. When multiple witnesses are involved: a. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses, b. If a positive identification is obtained from one witness, consider using other identification procedures (e.g., lineup, photo array) for remaining witnesses. 4. Caution the witness that the person he/she is looking at may or may not be the perpetrator. 5. Obtain and document a statement of certainty for both identifications and nonidentifications.
Summary: The use of a showup can provide investigative information at an early stage, but the inherent suggestiveness of a showup requires careful use of procedural safeguards.
B. Recording Showup Results
Principle: The record of the outcome of the field identification procedure accurately and completely reflects the identification results obtained from the witness.
Policy: When conducting a showup, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness.
Procedure: When conducting a showup, the investigator should: 1. Document the time and location of the procedure. 2. Record both identification and non-identification results in writing, including the witness’ own words regarding how certain he/she is.
Summary: Preparing a complete and accurate record of the outcome of the showup improves the strength and credibility of the identification or non-identification results obtained from the witness and can be a critical document in the investigation and any subsequent court proceedings.

In Commonwealth v. Johnson, supra, the Supreme Judicial Court explained that the concern about the risks associated with mistaken eyewitness identification procedures are not based on merely theoretical grounds. “[SJtudies conducted by psychologists and legal researchers since Braithwaite [Manson v. Braithwaite, 432 U.S. 98 (1977),] have confirmed that eyewitness testimony is often hopelessly unreliable.” See also United States v. Wade, 388 U.S. 218, 228 (1967) (“]T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification”); Commonwealth v. Marini, 375 Mass. 510, 519 (1978) (“The law has not taken the position that a juiy can be relied on to discount the value of an identification by a proper appraisal of the unsatisfactory circumstances in which it may have been made”). See generally Steven Penrod, “Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing?, ” 18 Criminal Justice 36 (No. 1, 2003) (American Bar Association) (analyzing studies about the accuracy of eyewitness identification evidence). Commonwealth v. Johnson, supra 420 Mass. at 467.

For this reason, a jury instruction approved for use by the Supreme Judicial Court in cases such as this includes the following language: “You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.” Commonwealth v. Cuffie, 414 Mass. 632, 641 (1993).

Even when the government has no involvement in a pretrial identification, it may occur under such suggestive *245 circumstances that the witness’s identification should be suppressed under common-law principles of fairness. Commonwealth v. Odware, supra, 429 Mass. at 235 (1999) (“Common-law principles of fairness are another basis to exclude witness identification testimony. See Commonwealth v. Jones, 423 Mass. 99, 109 (1996). In Jones, the witness saw the defendant only briefly at the time of the identification. Prior to the identification and without assistance from the Commonwealth, the witness saw the defendant shackled to a co-defendant in court for more than one hour. We concluded that common-law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances should be excluded.” (Citations and internal quotations omitted.)

The Supreme Judicial Court added that “(o]ne commentator has noted that ‘under Braithwaite [Manson v. Braithwaite, 432 U.S. 98 (1977)], the showup has flourished, because the totality approach has failed to discourage this practice. As a deterrent to suggestive police practices, the Federal standard is quite weak. Almost any suggestive lineup will still meet reliability standards.’ ” Commonwealth v. Johnson, supra, 420 Mass. at 468, quoting Note, Twenty Years of Diminishing Protection, 15 Hofstra L. Rev. 583, 606 (1987).

“Such identification procedures are justified by the need for prompt criminal investigation while the victim’s ‘recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture’ and it ‘provides the witness with good opportunity for an accurate identification.’ ” Commonwealth v. Barnett, 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). “Exigent or special circumstances are not a prerequisite to such confrontations.” Commonwealth v. Harris, 395 Mass. 296, 299 (1985). Accord, Commonwealth v. Leonardi, 413 Mass. 757, 761 (1992).

The full report is available on the World Wide Web at http://www.ncjrs.org/txtfiles 1 /nij /178261.txt.

A copy of Section IV of the Guide dealing with one-on-one identification procedures is contained in Appendix A. Other research suggests that the Guide does not go far enough. “[T]he primary role played by eyewitness confidence in the legal system’s assessment of the credibility of the identification, in conjunction with the clear empirical evidence of confidence malleability, demands that confidence in statements be obtained at the time of the identification (before other variables begin to exert their influence on the eyewitness).” See Wells et al., “Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, ” 22 Law and Human Behavior 1, 33 (1998).

Legislation proposing statutory guidelines to govern pretrial identification procedures by the police, consistent with the 1998 Justice Department Guide, has been filed in this session of the Massachusetts legislature on the House side by Representatives O’Flaherty, Fallon and Candaras, House Bill No. 748, and on the Senate side by Senators Creem and Creedon. Senate Bill No. 173. It appears that at least one state, New Jersey, has adopted the recommendations contained in the Guide. See Steven Penrod, “Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing?," 18 Criminal Justice 36, 54 (No. 1, 2003).

“A variable shown repeatedly to have considerable impact on eyewitness identifications from lineups is the pre-lineup instruction given to eyewitnesses . . . [T]he ratio of accurate to inaccurate identifications is strongly affected by whether or not eyewitnesses have been instructed (warned) prior to viewing the lineup that the culprit might or might not be in the lineup ... [T]he loss of accurate identifications from such instructions is minimal whereas the reduction of mistaken identifications is considerable.”G.L. Wells & W.O. Olson, “Eyewitness Testimony, ” 54 Annual Rev. Psychology 277, 286 (2003).

This is not a case in which the Commonwealth has established that the witness making the identification was not influenced by the suggestive remarks. See Commonwealth v. Thornley, 406 Mass. 96, 100-01 (1989), and cases cited. See also Commonwealth v. Poggi, 53 Mass.App.Ct. 685, 690-91 (2002). Moreover, it cannot be said that the presence of two suspects mitigated the suggestiveness of the remarks by the police because there is no evidence of whether they bore any similarity to each other.